**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WILSON DIVISION**

**YancyJazz, LLP,**                                        **CASE NO. 08-01071-8ATS**

                **Debtor.**                                      **CHAPTER 11**

**MOTION FOR ORDER REQUIRING**
**DEBTOR TO ASSUME OR REJECT**
**NON-RESIDENTIAL REAL PROPERTY LEASE**

Now Comes the Barney G. Joyner Family Trust, through its undersigned counsel of record, and moves the Court for an Order requiring the Debtor to assume or reject its non-residential real property lease for the premises located at 319 Fayetteville Street, Raleigh, North Carolina.  In support of this Motion, the Barney G. Joyner Family Trust states as follows:

1.      YancyJazz, LLP filed a Chapter 11 petition in this Court on February 19, 2008 and has, upon information and belief, operated its business as a Debtor-in-Possession since that date.

2.      On or about May 1, 2007, the Barney G. Joyner Family Trust ("hereinafter, the "Family Trust" or "Landlord") entered into a Lease Agreement with YancyJazz, LLP for the rental of Suite 105, 319 Fayetteville Street, Raleigh, North Carolina (the "Leased Premises") for a period of ten (10) years.  A copy of the Lease Agreement is attached hereto as Exhibit A and incorporated herein by reference.

3.      The Lease Agreement provides, <u>inter alia</u>, for the payment of monthly rent in the amount of $21,500.00, and prohibits the sublease of the premises without the Landlord's advance written consent.

4.      The Debtor has failed to pay monthly rental for the Leased Premises due on February 1, 2008 for the month of February, 2008.  Notice of such default was given by letter dated February 6, 2008, which is attached hereto as Exhibit B and incorporated herein by reference.  Additionally, the Debtor has failed to pay its March, 2008 rent, due on March 1, 2008.

5.      Upon information and belief, the Debtor has subleased the Leased Premises to Yancy's! Inc. without the advance written consent of the Landlord.

6.      Upon information and belief, the Debtor is unable to cure the defaults or provide adequate assurance of future performance under the Lease Agreement.

7.     Section 365(d)(2) of the Bankruptcy Code authorizes the Landlord to request that the Debtor assume or reject the Lease Agreement within a time period to be specified by the Court.

8.     The Landlord is entitled to an administrative claim for all rental accrued post-petition, notwithstanding assumption or rejection of the Lease.

WHEREFORE, the Barney G. Joyner Family Trust respectfully requests that the Court enter an order requiring the Debtor to assume or reject its Lease Agreement with it for the premises located at 319 Fayetteville Street, Raleigh, NC, and finding that all rents accrued post-petition under the Lease Agreement shall be accorded allowed administrative claim status.

This the 6th day of March, 2008.

*s/Stephani W. Humrickhouse*
Stephani W. Humrickhouse
North Carolina State Bar No. 9528
Attorney for the Barney G. Joyner Family Trust
NICHOLLS & CRAMPTON, P.A.
4300 Six Forks Road, Suite 700
Raleigh, NC  27609
Telephone: 919-781-1311

# THE HUDSON BUILDING
### GROUND FLOOR COMMERCIAL DISTRICT
### LEASE AGREEMENT -- TITLE PAGE

TENANT:     YancyJazz, LLP

DATED:     May 1, 2007

For the purposes of this Lease Agreement by and between JOYNER REALTY COMPANY, INC., as Agent for THE BARNEY G. JOYNER FAMILY TRUST ("Landlord") and YANCYJAZZ, LLP, a North Carolina limited liability partnership ("Tenant"), the terms set forth below, when preceded by a capital letter, shall have the meaning set forth in this Title Page and in the Lease.

## I.     *TENANT AND LANDLORD INFORMATION*

A. Landlord:   Joyner Realty Company, Inc., as Agent for The Barney G. Joyner Family Trust
B. Tenant:     YancyJazz, LLP
C. Landlord's Notice Address:     Joyner Realty Company, Inc.
815 New Bern Avenue
Raleigh, NC  27601

           With a Copy to:     Ronald Dorrestein, Esq.
Dorrestein & Crane, P.C.
141 Providence Road, Suite 160
Chapel Hill, NC   27514

D. Tenant's Notice Address:     YancyJazz, LLP
319 Fayetteville Street, Suite 105
Raleigh, NC 27601

           With a Copy to:     John P. Marshall, Esq.
White & Allen, P.A.
106 S. McLewean Street
Kinston, NC   28501

## II.     *DESCRIPTION OF PREMISES*

A. Building: Ground Floor Commercial District of The Hudson, 319 Fayetteville Street, Raleigh, Wake County, NC
B. Premises: Suite 105 (Space F-3 consisting of approx. 7,342 sq. ft.)
C. Permitted Use:  restaurant and bar with live music entertainment, which primarily includes serving food as well as alcoholic beverages, catering, banquets and the incidental sale of retail items

## III.     *TERM*

A. Commencement Date:   May 1, 2007
B. Expiration Date:   Ten (10) years following the Commencement Date.

## IV.     *RENT*

A.    Advance Rent:    n/a
B.    Rental Rate: $35.14/sq. ft.
C.    Initial Base Annual Rent:   $258,000.00
D.    Monthly Installment of Initial Base Annual Rent:  $21,500.00
E.    Operating Expenses:  $1,500 per month during the lease years one and two; thereafter Pro Rata share of operating expenses.
F.    Security Deposit:   $10,000.00

_____ Please Initial
_____ Please Initial
_____ Please Initial

TABLE OF CONTENTS

*ARTICLE I*          *PREMISES*
    Section 1.01          Premises

*ARTICLE II*         *USE*
    Section 2.01          Nature of Use
    Section 2.02          Reputation of The Hudson – Ground Floor Commercial District
    Section 2.03          Hazardous Activity/Materials
    Section 2.04          Signs, Awnings and Canopies
    Section 2.05          Rules and Regulations

*ARTICLE III*        *TERM*
    Section 3.01          Term of Lease
    Section 3.02          Commencement Date
    Section 3.03          Expiration Date
    Section 3.04          Lease Year
    Section 3.05          Miscellaneous

*ARTICLE IV*         *IMPROVEMENT OF PREMISES*
    Section 4.01          Improvement or Upfit Plans
    Section 4.02          Approval of Tenant Plans
    Section 4.03          Construction of Tenant Plans
    Section 4.04          Trade Fixtures
    Section 4.05          Equipment
    Section 4.06          Alterations, Improvements and Other Fixtures
    Section 4.07          Soundproofing

*ARTICLE V*          *RENT AND SECURITY*
    Section 5.01          Base Rent
    Section 5.02          Additional Rent
    Section 5.03          Operating Expense and Real Estate Taxes
    Section 5.04          Personal Property Tax and License Fees
    Section 5.05          Security Deposit

*ARTICLE VI*         *COMMON AREAS*
    Section 6.01          Common Areas
    Section 6.02          Suspension/Closure of Common Areas
    Section 6.03          Changes in Common Areas
    Section 6.04          Parking Areas

*ARTICLE VII*        *AFFIRMATIVE OBLIGATIONS*
    Section 7.01          Compliance with Laws
    Section 7.02          Services and Utilities
    Section 7.03          Repairs and Maintenance

*ARTICLE VIII*       *NEGATIVE OBLIGATIONS*
    Section 8.01          Assignment and Subleasing

*ARTICLE IX*         *OUTDOOR SEATING AREA*
    Section 9.01          Outdoor Seating Area

*ARTICLE X*          *INSURANCE and WAIVER OF SUBROGATION*
    Section 10.01          Insurance
    Section 10.02          Indemnification

_____ Please Initial
_____ Please Initial
_____ Please Initial

Section 10.03     Limitation of Landlord's Liability

*ARTICLE XI*   *ENVIRONMENTAL & OTHER GOVERNMENTAL COMPLIANCE*

*ARTICLE XII*  *LOSS OF PREMISES*
  Section 12.01   Damages
  Section 12.02   Condemnation

*ARTICLE XIII*  *DEFAULT*
  Section 13.01   Tenant's Default
  Section 13.02   Landlord's Remedies
  Section 13.03   Self-Help
  Section 13.04   Notice
  Section 13.05   Survival

*ARTICLE XIV*  *NON DISTURBANCE*
  Section 14.01   Subordination
  Section 14.02   Estoppel Certificate
  Section 14.03   Quiet Possession

*ARTICLE XV*  *LANDLORD'S RIGHTS*
  Section 15.01   Rules
  Section 15.02   Mechanic's Liens
  Section 15.03   Right to Enter
  Section 15.04   Holdover
  Section 15.05   Right to Sell or Transfer

*ARTICLE XVI*  *MISCELLANEOUS*
  Section 16.01   Brokerage Fees
  Section 16.02   Attorney's Fees
  Section 16.03   Notices
  Section 16.04   Partial Invalidity
  Section 16.05   Waiver
  Section 16.06   Waiver of Jury Trial and Counterclaim
  Section 16.07   Indemnification
  Section 16.08   Binding on Successors
  Section 16.09   Governing Law
  Section 16.10   Lease Not an Offer
  Section 16.11   Recording
  Section 16.12   Survival of Remedies
  Section 16.13   Authority of Parties
  Section 16.14   Accord and Satisfaction
  Section 16.15   Business Days
  Section 16.16   Entire Agreement
  Section 16.17   Headings
  Section 16.18   Time
  Section 16.19   No Rule of Construction
  Section 16.20   Principals of Tenant
  Section 16.21   OFAC
  Section 16.22   Definition of Lease

_____ Please Initial
_____ Please Initial
_____ Please Initial

# THE HUDSON BUILDING

## *COMMERCIAL SPACE (GROUND FLOOR) LEASE AGREEMENT*

THIS LEASE ("Lease") is entered into and effective as of May **1, 2007**, by and between **Joyner Realty Company, Inc., Agent for The Barney G. Joyner Family Trust**, with its principal offices at 815 New Bern Avenue, Raleigh, North Carolina 27601 (hereinafter "Landlord") and **YancyJazz, LLP**, a North Carolina limited liability partnership (hereinafter "Tenant").

### WITNESSETH:

**WHEREAS,** Landlord is the owner of that certain parcel of real estate located at the ground floor level (commercial district) of The Hudson Building, 319 Fayetteville Street, Raleigh, Wake County, North Carolina. The ground floor level (commercial district) of The Hudson Building is hereinafter referred to as the "Building" for convenience.

**WHEREAS,** Tenant desires to lease from Landlord certain property of Landlord, as more particularly described herein, and Landlord desires to lease the same to Tenant and the parties wish to enter into this Lease on the terms and conditions hereinafter set forth.

**NOW THEREFORE,** in consideration of the mutual covenants and conditions contained herein, including, without limitation, the covenant to pay rent and other good and valuable consideration, Landlord and Tenant hereby agree as follows:

Tenant hereby leases the Premises (as hereinafter defined) from Landlord and Landlord hereby leases the Premises to Tenant upon, and subject to, the terms and conditions hereinafter set forth in this Lease.

### ARTICLE 1
### PREMISES

**1.01     Premises.** Landlord leases to Tenant Suite 105 (Space F-3) of The Hudson Building, 319 Fayetteville Street, Raleigh, Wake County, North Carolina, with improvements thereon ("Premises") as outlined in red on Exhibit A. The Premises consists of approximately 7,342 square feet of rentable space in the Building. The Building is shown as Exhibit B and is located on the land described in Exhibit C ("Land"). The Premises contain the fixtures, improvements, and other property installed by Landlord or existing on the Premises prior to Tenant's possession.

The term "premises" shall not include the roof and exterior walls of the Premises or Building. The Landlord reserves the right to place in the Premises, in such manner as not to materially interfere with Tenant's use and quiet enjoyment of the Premises, utility lines, pipes, tunneling, and the like, to serve the Premises, other rented space, and the Common Areas, and to replace, maintain and repair such utility lines, pipes, tunneling, and the like, in, under, over and upon the Premises as may have been installed in the Building. Tenant shall have no rights with respect to the land or improvements below floor level or air rights above the ceiling of the Premises, other than Tenant's rights to use the Common Areas.

Tenant and its officers, agents, employees, customers, business visitors, business guests, licensees and invitees shall have access to the Premises, twenty-four (24) hours a day, seven (7) days a week. During non-business hours, Landlord may restrict access by requiring persons to show a badge or identification card issued by Landlord. Landlord shall not be liable for denying entry to any person unable to show the proper identification.

### ARTICLE II
### USE

**2.01     Nature of Use.** Tenant shall use the Premises solely for use as a restaurant and bar with live entertainment (to include primarily serving food as well as alcoholic beverages, catering, banquets and the sale of incidental retail items) unless Landlord gives its advance written consent to another use, which consent shall not be unreasonably withheld. Tenant shall not use the Premises in any manner that will constitute waste, nuisance, unreasonable annoyance to owners or occupants of adjacent properties or in any manner in violation of any law, regulation or ordinance of any public authority having jurisdiction over the Premises, or any restrictions affecting the Premises. Tenant shall use and occupy the Premises in a careful, safe and proper manner and shall keep the Premises in a clean, neat, orderly and safe condition, free of excessive noise, vibrations, odors and nuisances, all in accordance with applicable laws, regulations, rules, codes, rules and ordinances and the lawful direction of proper public officers and shall not do, or fail to do, anything within the Premises to increase the obligations or liabilities of the Landlord under any applicable laws, regulations, rules, codes or ordinances. Tenant shall in all respects and at all times fully comply with all health and policy regulations, as directly relates to Tenant's authorized use of the Premises. Tenant will not overload the floors or walls or permit to allow any waste, abuse, deterioration or destructive use of the Premises to occur. Tenant shall use and maintain the Premises consistent with present reasonable standards for restaurants and commercial establishments, and Tenant shall not permit solicitations, demonstrations, itinerant vending or any other activities inconsistent with such standards.

Tenant shall keep the Premises open and operated continuously for business not less than from 11:00 a.m. to 11:00 p.m. each day for at least six days a week. Tenant will continuously operate its business therein with diligence, fully staffed with personnel at the Premises. Tenant shall procure all licenses and permits required for the use or occupancy of the Premises and the business being conducted therein. Tenant agrees not to operate outside the Premises. Tenant shall keep the Premises free of rodents, vermin, insects and other pests, and provide regular exterminator services at its own expense.

_____ Please Initial
_____ Please Initial
_____ Please Initial

Immediately upon receipt of any notice or complaint (written or oral), letter, citation or other document pertaining to (i) the Tenant's operation of its business at the Premises, (ii) any activity for which Tenant could become liable for any civil damages or criminal penalty or (iii) any occurrence for which the Premises could become subject to any civil penalty or encumbrance, Tenant shall deliver written notice of the same, including a copy of the document, to Landlord and failure to do so shall constitute a material breach of this Lease.

Landlord shall not be liable for the act of any other tenant or person who may cause damage to or who may interfere with Tenant's use or occupancy of the Premises or Tenant's business.

**2.02     Reputation of The Hudson.**  Tenant shall not use, or allow the Premises to be used, for any purpose other than as specified herein. Further, Tenant shall not use nor permit the Premises to be used for any unlawful, disreputable or immoral purpose or in any way that will injure the reputation of the Hudson Ground Floor Commercial District or the Building, nor permit the Premises to be occupied in whole or in part by any other person except as otherwise provided herein.

**2.03     Hazardous Activity/Materials.**  Tenant shall not use or permit to be brought into the Premises or the Common Areas any flammable oils or fluids, or any explosive or other articles deemed to be hazardous to persons or property, or any hazardous or toxic waste. Tenant agrees that it will not do or suffer to be done, or keep or suffer to be kept, anything in, upon or about the Premises or Common Areas which will contravene Landlord's policies insuring against loss or damage by fire or other hazards, or which will prevent Landlord from procuring such policies with companies acceptable to Landlord; and if anything done, omitted to be done or suffered to be done by Tenant, or kept or suffered by Tenant to be kept, in, upon or about the Premises or Common Areas, shall cause the rate of fire or other insurance on the Premises or other property of Landlord, obtained pursuant to Article X, to be increased beyond the rate from time to time applicable to the Premises for use for the purposes permitted under this Lease or to such other property for the use or uses made thereof, Tenant will pay the amount of such increase promptly upon Landlord's demand. Tenant shall not do or permit its employees, agents, contractors, or persons acting under its control to do, anything in or upon the Premises or Common Areas, or bring or keep anything therein, which shall not comply with all rules, orders, regulations or requirements of any organization, bureau, department or body having jurisdiction with respect thereto (and Tenant shall at all times comply with all such rules, orders, regulations or requirements).  Landlord acknowledges and agrees that use of normal cleaning solvents in quantities normally sold in retail houseware stores shall not be a violation of Tenant's obligations under this Lease provided such solvents are stored, used and disposed of in accordance with applicable environmental laws, rules and regulations.  Further provisions pertaining to Hazardous Activity/Materials may be found hereinafter in Article XI.

**2.04     Signs, Awnings and Canopies.**  With the exception of those required by law, if any, Tenant will not place or cause to be placed or maintained on any exterior door, wall or window of the leased Premises any sign, awning or canopy, advertising matter or other thing of any kind, unless approved in writing by Landlord, which consent shall not be unreasonably withheld.  The required criteria for any sign to be erected on the exterior of the leased Premises is set forth on Exhibit D, attached hereto. Tenant further agrees that any costs associated with erection of such signage shall be Tenant's responsibility and that it shall maintain any sign, awning, canopy, decoration, lettering, advertising matter or other thing as may be approved by Landlord pursuant to this lease, in good condition and repair at all times.

**2.05     Rules and Regulations.**  The Rules and Regulations appended to this Lease as Exhibit D are hereby made part of this Lease, and Tenant agrees to comply with and observe the same. Tenant's failure to comply with said Rules and Regulations shall constitute a breach of the terms of this Lease in the same manner as if the same were contained herein as covenants. Landlord reserves the right to amend or supplement said Rules and Regulations from time to time and to adopt and promulgate additional rules and regulations applicable to the Premises and the Building. Notice of such additional rules and regulations, amendments and supplements, if any, shall be given to all tenants and Tenant agrees thereupon to comply with and observe all such applicable rules and regulations, amendments thereto and supplements thereof.

### ARTICLE III
### TERM

**3.01     Term of Lease.**  The term of this Lease and Tenant's obligation to pay rent hereunder shall be for a period of ten (10) years, plus the partial month, if any, immediately following the Commencement Date, except as provided otherwise herein.

**3.02     Commencement Date.**  This Lease shall be effective upon the date of its execution, but the Commencement Date, shall be on May 1, 2007.

The taking of possession of the Premises by Tenant shall be deemed conclusive that Tenant ACCEPTS THE PREMISES "AS IS" and that the Premises, sidewalks and other Common Areas (as defined in this Lease) were in good order and condition as of the Commencement Date. Unless specifically stated otherwise in this Lease, neither the Landlord nor its agents have made any representations with respect to the Premises and no rights, easements or licenses are acquired by Tenant by implication or otherwise.

**3.03     Expiration Date.**   The lease ends at 11:59 p.m. on the last day of the calendar month ten (10) years following the Commencement Date, unless terminated earlier under this Lease.

**3.04     Miscellaneous.**  Notwithstanding anything to the contrary, if Landlord shall be unable to give possession of the Premises on the date of the commencement of the term hereof by reason of any of the following: (i) labor disputes and/or material shortages (ii) Force Majeure or Acts of God (iii) the hold over or retention of possession of any tenant, tenants, or occupants; (iv) the acts or omissions of Tenant, whether or not negligent or intentional; or (v) for any other reason, beyond Landlord' reasonable control, Landlord shall not be subject to any liability for the failure to give possession on said date. Under such circumstances the rent reserved and covenanted to be paid herein shall not commence until the Premises are available for occupancy by Tenant (unless the delay is caused by the act or neglect of Tenant, in which case the obligation to pay rent shall not be delayed), and no

5

such failure to give possession on the date of commencement of the term hereof shall affect the validity of this Lease or the obligation of Tenant hereunder. At the option of Landlord, the Lease shall be amended so that the term shall be extended by the period of time possession is delayed.

## ARTICLE IV
## IMPROVEMENT OF PREMISES

**4.01    Improvement or Upfit Plans.** Tenant desires additional installations that vary from or are in excess of those existing in the Premises ("Tenant Improvements") and, as a result, space planning, architectural plans and specifications, and all structural, mechanical and electrical engineering plans and specifications, required for any improvements or upfit plans, have or will be obtained by Tenant. All costs associated with said space planning, as well as the architectural, mechanical and electrical engineering plans, specifications and drawings, including construction drawings stamped by a licensed architect and submitted for approvals and permits for the improvements or upfit plans, are included as part of the Tenant Improvements and shall be at Tenant's sole cost. Tenant shall also be responsible for the minimum construction and upfitting requirements set forth on Exhibit E attached hereto and incorporated herein by reference. All plans and specifications shall be submitted to Landlord for approval prior to the commencement of any improvements or upfit work, such approval not to be unreasonably withheld or delayed. Pursuant to a prior lease, Landlord previously provided Tenant with an improvement allowance for the Premises in the amount of One Million Ninety-seven Thousand Nine Hundred Twenty-eight and 44/100 Dollars ($1,097,928.44), all of which said improvement allowance has been expended by Tenant (the "Upfit Expenditures"). Landlord shall have the right to demand and Tenant agrees, with or without demand by Landlord, to provide evidence of Tenant's said Upfit Expenditures, including an audit of said Upfit Expenditures by an accountant approved by Landlord. Tenant will deliver a complete record of the Upfit Expenditures and supporting documentation within five (5) days following demand for the same by Landlord.

All Tenant Improvements shall become the property of Landlord and shall remain in and upon the Premises at the expiration of this Lease. This Lease shall be the equivalent of a Security instrument and the Landlord will be permitted to file financing statements to secure its investment.

**4.02    Approval of Tenant Plans.** If Landlord fails to approve or disapprove the Tenant Plans within ten (10) business days of receipt, the Tenant Plans shall be deemed approved as submitted. Upon approval, said Tenant Plans shall be attached hereto as Exhibit D and incorporated herein by reference.

**4.03    Construction of Tenant Plans.** Tenant shall be solely liable and responsible for the implementation and management of the construction of Tenant Improvements, which shall be performed in accordance with the Tenant Plans, applicable laws, rules, regulations and building codes. At all times, Landlord shall have the right to inspect the progress and verify the adequacy of construction of the Tenant Improvements.

**4.04    Trade Fixtures.** Tenant has installed trade fixtures as part of the Tenant Improvements enumerated in Section 4.01 which have become the property of the Landlord. With respect to the installation of future fixtures in the Premises; provided, however, that (a) Tenant obtains the prior written consent of Landlord, which consent shall not be unreasonably withheld, (b) Tenant will, at its own expense, obtain any and all necessary permits or licenses required for placement and installation of said fixtures, and (c) Tenant promptly, and at its own expense, repairs any damage to the Premises as a result of installing said trade fixtures. All trade fixtures installed by Tenant in the Premises shall become the property of Landlord and shall remain in and upon the Premises at the expiration or earlier termination of this Lease.

**4.05    Equipment.** Tenant has installed equipment as part of the Tenant Improvements enumerated in Section 4.01 which have become the property of the Landlord. If the equipment is damaged for any reason, not properly serviced and maintained, repaired or replaced, upon notice to Tenant Landlord shall have the option to perform the proper service, maintenance, repairs or replacements and charge the Tenant for the cost of same as Additional Rent hereunder. If Landlord incurs the aforesaid charges during the first 24 months of the Lease, Tenant shall pay to Landlord the aforesaid charges in addition to the additional rent of $1,500.00 per month. With respect to the installation of future equipment in the Premises, Tenant may request, at its own expense, to place, install, and/or maintain equipment in and upon the Premises as Tenant, in its sole discretion, shall deem necessary or appropriate for the purpose of carrying on business upon the Premises; provided, however, that (a) Tenant obtains the prior written consent of Landlord, which consent shall not be unreasonably withheld, (b) Tenant has, at its own expense, obtained any and all necessary permits or licenses required for erection and maintenance for placement and installation of said equipment and fixtures, and (c) Tenant promptly, and at its own expense, repairs any damage to the Premises as a result of installing said equipment. All equipment installed by Tenant in the Premises shall remain in and upon the Premises at the expiration or earlier termination of this Lease.

**4.06    Alterations, Improvements and Other Fixtures.** Tenant may, at its own expense, from time to time during the Lease term, make nonstructural alterations, additions, substitutions, installations, changes and improvements ("Alterations") in and to the interior of the Premises as it may find necessary for its purposes, provided that the value of the Premises is not thereby diminished, and further provided that no such Alterations may be made without first obtaining the written approval and consent of Landlord, said approval and consent shall not be unreasonably withheld. Tenant shall submit the following to Landlord for approval prior to the commencement of any such Alterations, such approval not to be unreasonably withheld or delayed: (i)  copy of reasonably details plans and specifications for the Alterations; (ii) the name, address and contact numbers for the contractor (who/which shall be subject to Landlord's review and approval) ; (iii) projected start and completion dates; and (iv) proof of adequate insurance coverage by Tenant and/or contractor for the work which names Landlord as an additional insured. Landlord, in its sole discretion, may require Tenant to supply a lien and completion bond, bank letter of credit, or other security satisfactory to Landlord, in an amount equal to the estimated cost of the Alteration to insure Landlord against materials and mechanics' liens and against completion of the Alteration. Tenant shall perform and complete any such Alterations with due diligence in accordance with the approved plans and specifications, in a workmanlike manner, in compliance with all applicable laws, codes, regulations, rules, ordinances and other governmental requirements, in a manner

---

6

_____ Please Initial
_____ Please Initial
_____ Please Initial

which shall not disturb the quiet possession of other tenants of the Building or interfere with the construction, operation or maintenance of the Building. Any and all such Alterations shall immediately become Landlord's property and, at the end of the term hereof, shall remain on the Premises without compensation to Tenant. Landlord may require Tenant to remove any such Alterations at the expiration or sooner termination of the Lease term, in which event Tenant shall, at its sole cost and expense, remove any such Alterations and promptly repair and restore the Premises to their condition as of the Commencement Date of this Lease.

**4.07    Soundproofing.**  Tenant shall at all times solely be responsible and liable, financially or otherwise, for adequately soundproofing the Premises so as to comply with this Lease, and more particularly Articles III and IV.

*ARTICLE V*
**RENT AND SECURITY**

**5.01    Base Rent.**  Tenant shall pay to Landlord Base Rent during the Term, as follows:

| Years | | Annual Base Rents | Monthly Base Rents |
|---|---|---|---|
| Year 1 | (5/1/2007 – 4/30/2008)* | $258,000.00 | $21,500.00 |
| Year 2 | (5/1/2008 -- 4/30/2009) | $270,000.00 | $22,500.00 |
| Year 3 | (5/1/2009 -- 4/30/2010) | $288,000.00 | $24,000.00 |
| Year 4 | (5/1/2010 -- 4/30/2011) | $293,760.00 | $24,480.00 |
| Year 5 | (5/1/2011 -- 4/30/2012) | $299,640.00 | $24,970.00 |
| Year 6 | (5/1/2012 -- 4/30/2013) | $305,628.00 | $25,469.00 |
| Year 7 | (5/1/2013 -- 4/30/2014) | $311,736.00 | $25,978.00 |
| Year 8 | (5/1/2014 -- 4/30/2015) | $317,976.00 | $26,498.00 |
| Year 9 | (5/1/2015 -- 4/30/2016) | $324,336.00 | $27,028.00 |
| Year 10 | (5/1/2016 -- 4/30/2017) | $330,828.00 | $27,569.00 |

*Annual Base Rent for Year 1 is based on a 12-month calculation, although Tenant's obligation to pay Base Rent is subject to the Rent Commencement Date as follows:

   i)     Rent Commencement Date.  The parties agree that the Tenant's obligation to pay Base Rent and Additional Rent shall commence on May 1, 2007.

The Base Rent shall be paid:

   (a)    without advance notice, demand, offset, or deduction;

   (b)    in advance and **by the first (1st) day of each month** during the Term;

   (c)    in lawful money of the United States; and

   (d)    to Landlord at its address set forth in Section 16.02 or as Landlord may specify in writing to Tenant.

If the Term does not begin on the first day or end on the last day of a month, the Base Rent and Additional Rent (as hereinafter defined) for that partial month shall be prorated by multiplying the monthly Base Rent by a fraction, the numerator of which is the number of days of the partial month included in the Term and the denominator of which is the total number of days in the full calendar month.

**Additional Base Rent.**  Tenant shall pay Landlord Additional Base Rent, to the extent annual gross sales exceed FOUR MILLION FIFTY THOUSAND AND 00/100 DOLLARS ($4,050,000.00). In that event, Tenant shall pay Landlord the difference between the sum of the annual base rent and annual additional rent versus SEVEN PERCENT (7%) of gross revenues. Tenant shall pay the additional base rent on a quarterly basis, but no later than the tenth day of the succeeding quarter. Tenant shall allow Landlord to audit Tenant's records and/or provide, at Landlord's election, documentation pursuant to generally accepted accounting principles, including, but not limited to, point of sale reports and monthly bank statements listing any and all deposits. In example:

| Quarter | Base Rent | Additional Rent | Total Rent | Gross Sales | 7% | Additional Base Rent Due |
|---|---|---|---|---|---|---|
| 1 | 64,500 | 4,500 | $69,000 | $1,200,000 | $84,000 | $15,000 |
| 2 | 64,500 | 4,500 | $69,000 | $ 900,000 | $63,000 | $0 |
| 3 | 64,500 | 4,500 | $69,000 | $1,300,000 | $91,000 | $21,000 |
| 4 | 64,500 | 4,500 | $69,000 | $1,400,000 | $98,000 | $29,000** |
| | | | $276,000 | $4,800,000 | $336,000 | |

** The additional base rent due for quarter 4 shall be grossed up as follows:  Tenant shall pay as Additional Base Rent $60,000 (336,000 – 276,000).  Tenant has paid $36,000, leaving a balance due of $24,000.  Based on this example, additional base rent due for quarter 4 shall be adjusted from $29,000 downward to $24,000.

_____ Please Initial
_____ Please Initial
_____ Please Initial

If Tenant fails to pay part or all of the Base Rent, Additional Base Rent and/or Additional Rent by the fifth (5th) day of the month due, unless said failure is due to Force Majeure or Acts of God, it is past due, and the Tenant shall also pay:

    (a)    a late charge equal to four percent (4%) of the unpaid Base Rent and/or Additional Rent, plus

    (b)    interest at eighteen percent (18%) per annum or the maximum then allowed by applicable law, whichever is less, on the remaining unpaid balance, retroactive to the date originally due until paid.

**5.02    Additional Rent.**  Any other sums of money or charges to be paid by the Tenant pursuant to the provisions of any other sections of this Lease shall be designated as "Additional Rent."  Any Additional Rent due pursuant to this Lease, including interest and penalty, shall survive the Expiration Date.  Additional rent shall be capped at $1,500.00 per month during the first 24 months of the Lease.

**5.03    Operating Expenses and Real Estate Taxes.**

As Additional Rent, Tenant shall pay an amount equal to Tenant's Proportionate Share of the operating expenses, insurance and real estate taxes for the Building, its equipment and systems, (collectively the "Property") in accordance with the following:

    (a)    **Definitions.**

        (i)    **"Tenant's Proportionate Share"** shall be determined by multiplying each such amount by a fraction, the numerator of which is the total square footage in the Premises, as set forth in Section 1.01, and the denominator of which is the total square footage in the Building, approximately _____ square feet.

        EXCEPTION:  Notwithstanding anything to the contrary in this Lease, in the event Tenant is the main or greater than Tenant's Proportionate Share user or source of an operating expense, Landlord has the option to allocate all or part of that operating expense in Landlord's sole discretion to Tenant.

        (ii)    **"Real Estate Taxes"** means real property taxes and currently due installments of assessments, special or otherwise, imposed upon the Building.  If any non-Real Estate Taxes are imposed against the Landlord in substitution for any Real Estate Taxes, then the substituted tax shall be considered a Real Estate Tax. Conversely, if any additional Real Estate Taxes are imposed in substitution for any non-Real Estate Taxes (that are not Substituted Taxes) they shall not be considered Real Estate Taxes.  Real Estate Taxes shall exclude federal, state or local income taxes, franchise, gift, transfer, excise, capital stock, estate, succession, or inheritance taxes, and penalties or interest for late payment of Real Estate Taxes.

        (iii)    **"Operating Expenses"** means Landlord's operating expenses that are reasonable, actual, and out-of-pocket (except Landlord may use its normal accrual method of accounting), obtained at competitive prices, and that are directly attributable to the operation, maintenance, management, repair and replacement of the Building, as determined under generally accepted accounting principles consistently applied, including:

        (1)    salaries, and other compensation; payroll taxes, vacation, holiday, and other paid absences; and welfare, retirement, and other fringe benefits that are paid to employees, independent contractors, or agents of Landlord engaged in the operation, repair, management, or maintenance of the Property;

        (2)    replacement, repairs and maintenance of the Property and the cost of supplies, tools, materials, and equipment for Property repairs and maintenance, that under generally accepted accounting principles consistently applied, would not be capitalized;

        (3)    premiums and other charges incurred by Landlord for insurance on the Property and for its employees including:

            -a-    fire insurance, extended coverage insurance, and earthquake, windstorm, hail, and explosion insurance;

            -b-    public liability and property damage insurance;

            -c-    elevator insurance, if applicable;

            -d-    workers' compensation insurance;

            -e-    boiler and machinery insurance; sprinkler leakage, water damage, water damage legal liability insurance; burglary, fidelity, and pilferage insurance on equipment and materials;

            -f-    insurance Landlord is required to carry under this Lease; and

            -g-    other insurance as is customarily carried by operators of comparable  office buildings in the Raleigh/Durham, North Carolina area;

        (4)    costs incurred for inspection and servicing, including all outside maintenance contracts necessary or proper for the maintenance of the Property, such as janitorial and window cleaning, rubbish removal,

8

_____ Please Initial
_____ Please Initial
_____ Please Initial

exterminating, water treatment, elevator, electrical, plumbing, and mechanical equipment, and the cost of materials, tools, supplies, and equipment used for inspection and servicing;

(5)   costs incurred for electricity, water, gas, fuel, or other utilities for the Property;

(6)   sales, use, and excise taxes on goods and services purchased by Landlord for use on the Property, but Tenant's pro rata share shall exclude prepaid services that are not used by Landlord;

(7)   license, permit, and inspection fees for the Property;

(8)   auditor's fees for public accounting for the Property;

(9)   reasonable legal fees, costs, and disbursements by and for the Property;

(10)  reasonable management fees to a person or entity other than Landlord (provided, such person or entity may be affiliated with Landlord) for the management of the Property;

(11)  the annual amortization over its useful life with a reasonable salvage value on a straight-line basis of (i) the costs of any capital improvements made by Landlord and required by any changes in applicable laws, rules, or regulations of any governmental authorities; or (ii) the costs of any equipment or capital improvements made by Landlord, as a labor-saving measure or to accomplish other savings in operating, repairing, managing, or maintaining of the Property, but only to the extent of the savings; or (iii) the costs of any exterior window draperies provided by Landlord and the carpeting in the Common Areas;

(12)  any costs for substituting work, labor, materials, or services in place of any of the above items, or for any additional work, labor, materials, services or improvements to comply with any governmental laws, rules, regulations, or other requirements applicable to the Property, that, at the time of substitution or addition, are considered operating expenses under generally accepted accounting principles consistently applied;

(13)  other costs reasonably necessary to operate, repair, manage, and maintain the Property in a manner and condition consistent with comparable office buildings in the Raleigh-Durham, North Carolina area; and

Operating Expenses shall exclude:

(1)   leasing commissions, costs, disbursements, and other expenses incurred for leasing, renovating, or improving space for tenants;

(2)   costs (including permit, license, and inspection fees) incurred in renovating, improving, decorating, painting, or redecorating vacant space or space for tenants;

(3)   Landlord's cost of electricity or other service sold to tenants for which Landlord is to be reimbursed as a charge over the Base Rent and Additional Rent payable under the lease with that tenant;

(4)   depreciation and amortization on the Building except as expressly permitted elsewhere in this Lease;

(5)   costs of a capital nature including capital improvements, capital repairs, capital equipment, and capital tools, as determined under generally accepted accounting principles consistently applied, except that the annual amortization of these costs shall be included to the extent expressly permitted elsewhere in this Lease;

(6)   costs incurred because the Landlord or tenants violated the terms of any lease (including without limitation legal fees and disbursements);

(7)   interest on debt or amortization payments on mortgages or deeds of trust or any other debt for borrowed money;

(8)   advertising and promotional expenditures;

(9)   repairs or other work needed because of fire, windstorm, or other casualty or cause insured against by Landlord to the extent Landlord's insurance provided coverage insurance for same;

(10)  other expenses that under generally accepted accounting principles consistently applied would not be considered normal maintenance, repair, management, or operation expenses.

(11)  fines or penalties incurred by Landlord;

(12)  mortgage or ground rent uses.

(vi)  **"Adjustment Period"** means each calendar year or partial calendar year occurring during the Term.

_____ Please Initial
_____ Please Initial
_____ Please Initial

(b)  **Credits/Reimbursements.**  Operating Expenses shall be reduced by reimbursements, credits, discounts, reductions, or other allowances received or receivable by Landlord for items of cost included in Operating Expenses, except reimbursements to the Landlord by tenants under this Article V.

(c)  **Tenant's Proportionate Share of Taxes:**  Tenant's proportionate share of the said taxes shall be paid as provided in subparagraph 5.03(d) below; provided, however, that any increase in ad valorem taxes on the Property as a result of alterations, additions or improvements made by, for, or on account of Tenant shall be reimbursed by Tenant to Landlord within thirty (30) days after receipt of written demand therefore.  Tenant shall also pay Tenant's proportionate share of all reasonable attorney fees incurred by Landlord as a result of any challenge by Landlord to an increase in Real Estate Taxes which Landlord fees is discriminatory or unreasonable.  Tenant shall entitled to its proportionate share of any ad valorem tax abatements achieved through any such challenges.

(d)  **Payment of Proportionate Share:**  Landlord shall add together all of the Tenant's proportionate shares of  the Real Estate Taxes and all Operating Expenses for the preceding calendar year (the "annualized amount") and divide the total by twelve (12), and said amount shall be paid by the Tenant as Additional Rent each month, in addition to its Monthly Base  Rent.

Within one hundred twenty (120) days after the end of each calendar year, or partial calendar year, occurring during the Term (the "Adjustment Period"), or as soon as reasonably practical, Landlord shall give Tenant an itemized statement ("Statement") showing the following:

(1)  actual Operating Expenses and Real Estate Taxes for the Adjustment Period;

(2)  the Operating Expenses and Real Estate Tax increases or decreases for the Adjustment Period, if any;

(3)  the amount of Tenant's Proportionate Share of the Operating Expenses and Real Estate Tax increase or decrease, as applicable (for the calendar year for which this Lease commences and the calendar year in which this Lease expires, the Tenant's proportionate share shall be prorated based upon the number of days the Lease term is in effect in relation to three hundred sixty-five (365) days, unless this Lease was terminated because of Tenant's default); and

(4)  the amount Tenant owes, or has overpaid, toward the Operating Expenses and Real Estate Tax increase, if any.

Landlord's failure to provide such Operating Expense Statement by the date provided above shall in no way excuse Tenant from its obligation to pay its proportionate share of the Operating Expenses and Real Estate Tax and shall not constitute a waiver of Landlord's right to bill and collect such proportionate share from Tenant in accordance with the terms of this Lease.

(i)  In the event the actual costs for the year are greater or lesser than the annualized amount based on the preceding year, then the Tenant shall reimburse the Landlord for any shortages under the actual amounts or the Landlord shall reimburse the Tenant for any overages paid over the actual expenses, and the annualized amount for the next calendar year shall be adjusted upward or downward accordingly.

(ii)  If is determined that Tenant owes toward the Operating Expenses and Real Estate Tax increase, Tenant shall pay the cost thereof to Landlord within thirty (30) days after receiving said Statement.  Tenant's failure to pay within the thirty-day period shall entitle Landlord to the same remedies it has upon Tenant's failure to pay Base Rent.  If it is determined that Tenant has paid an amount in excess of its proportionate share of the Operating Expenses and Real Estate Taxes, Landlord will promptly refund to Tenant any such overpayment by way of a credit towards future Monthly Base Rent and Additional Rent during the term of this Lease or, if the Lease has terminated, by way of a cash payment.

(iv)  Within thirty (30) days of the Lease expiration date, Landlord may require Tenant to pay any unpaid proportionate share of the Operating Expenses and Real Estate Tax by (i) estimating the same based upon actual and estimated costs for such year or (ii) billing the Tenant upon receipt and itemization of the actual expenses.  Tenant hereby agrees to pay the same within ten (10) business days of receipt of said itemization and billing.

(v)  Notwithstanding any other right or remedy conferred upon Landlord pursuant to this Lease, at law or in equity, if Tenant fails to pay, when due and payable, charges of any kind or character provided for in this Section 5.03 of the Lease, such unpaid amount shall bear interest at eighteen percent (18%) per annum, or the maximum then allowed by applicable law, whichever is less, from the date due until the date of payment

**5.04   Personal Property Tax and License Fees.**  Before delinquency Tenant shall pay taxes assessed during the Term against trade fixtures or personal property placed by Tenant in the Premises. If these taxes are assessed against the Building, Tenant shall pay its share of the taxes to Landlord within ten (10) days after receiving Landlord's written statement setting forth the amount of taxes applicable to Tenant's property and the basis for the charge to Tenant. Tenant's failure to pay within the ten-day period shall

_____  Please Initial
_____  Please Initial
_____  Please Initial

entitle Landlord to the same remedies it has upon Tenant's failure to pay Base Rent.  Tenant shall also pay all license fees which are imposed upon the business of Tenant.

**5.05    Security Deposit.**  The Tenant has deposited Ten Thousand and 00/100 Dollars ($10,000.00) (the "Security Deposit") with Landlord to secure Tenant's performance of its Lease obligations.  Landlord may mix the Security Deposit with its own funds, and interest on the Security deposit, if any, shall belong solely to Landlord.  If Tenant defaults under this Lease, Landlord may, without prejudice to Landlord's other remedies, apply part or all of the Security Deposit to cure Tenant's default.  If Landlord so uses part or all of the Security Deposit, then Tenant shall within ten (10) days after written demand, pay Landlord the amount used to restore the Security Deposit to its original amount.  Tenant shall not have the right to call upon the Landlord to apply all or part of the Security Deposit towards the fulfillment of Tenant's obligations under this Lease.  Any part of the Security Deposit not used by Landlord as permitted by this paragraph shall be returned to Tenant within forty-five (45) days after the Lease ends.  If Landlord does not return the entire Security Deposit, Landlord will provide to Tenant an itemized statement of Landlord's use of the portion of the Security Deposit not returned to Tenant.  If Landlord shall sell the Premises in fee simple during the term of this Lease, Landlord may deliver the Security Deposit to the Grantee and thereupon be released of all liability with respect to the Security Deposit.

*ARTICLE VI*
**COMMON AREAS**

**6.01    Common Areas.**  Tenant and its officers, agents, employees, customers, business visitors, business guests, licensees and invitees have the non-exclusive right with others designated by Landlord to the free use of the Common Areas (as hereinafter defined) in or about the Building for the Common Areas' intended and normal purposes, subject to such reasonable rules and regulations as Landlord may from time to time impose.  Tenant agrees, after notice thereof, to abide by such reasonable rules and regulations and to use its best efforts to cause its concessionaires, officers, employees, agents, customers, business visitors, business guests, licensees and invitees to conform thereto.  Said use shall be in common with Landlord and all others to whom Landlord has or may hereafter grant similar non-exclusive rights to use the same, including, but not limited to, the Landlord and other tenants of the Building, and the officers, employees, agents, customers, business visitors, business guests licensees and invitees of such owners and tenants, their successors and assigns.  Common Areas include all areas and facilities, space, equipment, signs and special services provided by Landlord for the common or joint use and benefit of the tenants of the Building, including, without limitation, sidewalks, parking areas, driveways, streetscaping, hallways, stairways, ramps, comfort and first-aid stations, public bathrooms, common entrances, lobby, and other similar public areas and access ways.  Tenant shall not interfere with Landlord's or other tenants' rights to use any part of the Common Areas.

**6.02    Suspension/Closure of Common Areas.**  All Common Areas in or about the Building provided by Landlord shall be subject to the exclusive control and management of Landlord.  Use by Tenant shall be subject to such reasonable and nondiscriminatory rules and regulations as Landlord may from time to time adopt governing the same.  Landlord may at any time close temporarily any of the Common Areas to make repairs or changes therein or to effect construction, repairs or changes within the Building, and may do such other acts in and to the Common Areas as Landlords elect to improve the convenience thereof.  Tenant consents and agrees that any and/or all of the Common Areas and any and all service facilities and any access by public to the Premises or the Building may be suspended, in whole or in part, during such times as on legal holidays, or such other days as may be declared by local, state or federal authorities as days of celebration or observance, or during any period of actual or threatened civil commotion, insurrection or other circumstances beyond Landlord's control when Landlord, in Landlord's absolute judgment, shall deem the suspension of such services, facilities and access necessary for the protection and preservation of persons or property.  The contrary contained in this Section 6.02 notwithstanding, Landlord will not restrict the rights of Tenant to conduct its business.  Landlord shall have the right to close any or all portions of the Common Areas to such extent as in Landlord's opinion may be legally sufficient to prevent a dedication thereof or the accrual of any rights to any person or to the public therein and to close temporarily, if necessary, any part of the Common Areas in order to discourage non-customer parking.  All space, areas, and facilities on the Land and in the Building are to be used and occupied under a license, and if the amount of such space, areas and facilities are diminished, this Lease shall remain in full force and effect and Landlord shall not be subject to any liability nor will Tenant be entitled to any compensation or diminution in rent, nor shall diminution of such space, areas and facilities be deemed constructive or actual eviction provided such closure does not materially adversely affect Tenant's business without a proportionate abatement of rent.

**6.03    Changes in Common Areas.**  Landlord may change the Common Areas, including the right to reasonably add to or subtract from their shape and size, as well as to alter their location, provided such changes do not materially and unreasonably interfere with Tenant's access to or use of the Premises.  Landlord shall also have the right at any time and from time to time to enter into, change, modify or terminate easements, cross-easements and other easements pertaining to the use and maintenance of the Common Areas of the Building.

**6.04    No Parking.**  It is expressly understood by the Tenant that no parking rights or parking spaces within the Building or within or adjacent to any portion of The Hudson Building, or any other building, are part of the leasehold interest being conveyed unto the Tenant by this Lease.

*ARTICLE VII*
**AFFIRMATIVE OBLIGATIONS**

**7.01    Compliance with Laws.**

   (a)  **Landlord's Compliance.**  Landlord warrants, that on the Commencement Date, the Premises will comply with all applicable laws, ordinances, codes, rules, and regulations of governmental authorities ("Applicable Laws").  During

---

11

the Term, Landlord shall comply with all Applicable Laws regarding the Premises and Building except to the extent Tenant must comply under Section 7.01(b).

(b)   **Tenant's Compliance.**  Tenant shall comply with all Applicable Laws (i) regarding the physical condition of the Premises, but only to the extent the Applicable Laws pertain to the particular manner in which Tenant uses the Premises; or (ii) that do not relate to the physical condition of the Premises but relate to the lawful use of the Premises and with which only the occupant can comply, such as laws governing maximum occupancy, workplace smoking, and illegal business operations, such as gambling.  Notwithstanding the foregoing, Tenant shall comply with any requirements imposed under the Americans with Disabilities Act of 1990 ("ADA") which relate exclusively to the Premises.

**7.02   Services and Utilities.**

(a)   **Services.**  Landlord shall provide at its expense maintenance of any Common Areas of the Building, including exterior maintenance of The Hudson which is not handled by the Hudson Condominium Unit Owners Association, Inc., in a commercially reasonable manner.  Said exterior maintenance shall not include the exterior doors, plate glass or window frames for the Premises.  Landlord shall be responsible for contracting for a refuse and garbage removal system for the Building consistent with the laws and health regulations of the applicable jurisdiction.  All costs associated with Landlord's services shall be included in the Operating Expenses and Tenant shall be responsible for its pro rata share of the same as provided for in this Lease.

Tenant shall provide and pay for its own heat, air conditioning, gas, electricity, and other utilities, including application deposits and installation charges for any meters and for consumption or use of said utilities.  Tenant shall keep sufficient heat in the Premises to prevent the pipes from freezing.

(b)   **Water Usages and Billing.**  It is the parties understanding that the Premises has a separate water meter and that all water usage, including applicable sewer and storm water fees and sprinkler use, for the Premises will be billed directly to and be the sole responsibility of Tenant.  In the event the Premises does not have a separate water meter, for whatever reason, the parties shall arrange for the installation of either (i) a separate water meter for the Premises or (ii) a water usage meter which will monitor and measure Tenant's water usage so as to distinguish Tenant's water usage from the water usage of other tenants in the Building, with the costs of said installation to be the sole responsibility of Landlord.

In the event a water usage meter is installed, Landlord shall submit bills to Tenant for said water use (including charges for sewer and storm water fees calculated from a formula obtained from the City of Raleigh) at least quarterly and Tenant shall be responsible for reimbursing Landlord for the water use at the Premises within five (5) days of receipt of said bills.  Neither Tenant, its contractors, employees, nor agents shall attempt to operate, repair or touch the water usage meter without the express authorization of the Landlord with a City of Raleigh employee present.

(c)   **Interruption of Services.**  Landlord does not warrant that any services Landlord supplies will not be interrupted.  Services may be interrupted because of accidents, repairs, alterations, improvements, or any reason beyond the reasonable control of Landlord, and such an interruption shall not:

(i)   be considered an eviction or disturbance of Tenant's use and possession of the Premises;

(ii)   make Landlord liable to Tenant for damages;

(iii)   abate Base Rent or any Additional Rent; or

(iv)   relieve Tenant from performing Tenant's Lease obligations.

**7.03   Repairs and Maintenance.**

(a)   **Tenant's Care of Premises.**  Tenant shall be responsible for all repairs, maintenance and replacements of and to the Premises which are not the responsibility of Landlord, and shall:

(i)   keep the Premises and fixtures, facilities or equipment contained therein, in good order, condition and repair, normal wear and tear excepted, including but not limited to the regular maintenance, repair or replacement of the heating, air conditioning, mechanical, electrical, plumbing, sprinklers, sewer systems (to include cleaning out the grease traps), lighting fixtures and audio-visual equipment exclusively servicing the Premises, nonstructural portions of the storefront, glass, signs, ceiling, interior walls, interior side of perimeter walls, floor (except when necessitated by deterioration of the subflooring, unless the same is due to actions or inactions of the Tenant, its contractors, employees or agents), floor coverings, exterior antennae, satellite dish or exterior lighting installed by Tenant, interior and exterior doors (including glass doors), all door hardware, all windows, plate glass and window frames of the Premises, and shall make any replacements thereof and of all broken and cracked glass as may become necessary during the term of this Lease or any renewal or extension thereof, excepting, however, such repairs and replacements as are the obligation of Landlord under Section 7.02(a) hereof, and excepting any repairs made necessary by reason of damage due to fire or other casualty covered by standard fire and extended coverage insurance.  Tenant shall maintain a service contract for the regular seasonal maintenance of the heating, ventilating and air conditioning ("HVAC") system servicing the Premises with a reputable HVAC contractor at all times during the Lease.  WHEN REGULARLY SERVICING THE HOOD VENTS OR THE HVAC SYSTEMS LOCATED ON THE ROOF OF THE BUILDING, TENANT SHALL AT ALL TIMES HAVE PRESENT

_____ Please Initial
_____ Please Initial
_____ Please Initial

A REPRESENTATIVE OF BAKER ROOFING COMPANY, OR ITS SUCCESSOR, WHEN PERFORMING SAID SERVICING ON THE ROOF OF THE BUILDING SO AS NOT TO VOID THE ROOFING WARRANTY. TENANT SHALL BE STRICTLY LIABLE TO LANDLORD FOR ANY AND ALL DAMAGES, DOLLAR FOR DOLLAR, THAT LANDLORD INCURS IF THIS REQUIREMENT IS NOT COMPLIED WITH AND/OR IF THE ROOF IS DAMAGED DURING SAID SERVICING.   Additionally, if any HVAC equipment (or other utility equipment) is damaged by vandalism, fire, lighting or other casualty, Tenant shall repair (and if necessary, replace) the equipment, notwithstanding Article X.  Tenant's sole right of recovery shall be against Tenant's insurers for loss or damage to stock, furniture, fixtures and inventory and equipment.  Landlord hereby warrants and represents that, upon the commencement date of the Lease, all of the above items, unless otherwise placed in the Premises or affected by Tenant, are in good and proper working order and free of defects.

(ii)   make repairs or replacements to the Premises or Building needed because of Tenant's misuse or negligence, except to the extent that the repairs or replacements are covered by Landlord's insurance or the insurance Landlord is required to carry under this Lease, whichever is greater;

(iii)   repair and replace special equipment or decorative treatments installed by or at Tenant's request and that serve the Premises only, except

(1)   to the extent the repairs or replacements are needed because of Landlord's misuse or primary negligence, and are not covered by Tenant's insurance or the insurance Tenant is required to carry under this Lease, whichever is greater; or

(2)   if the Lease is terminated under Article XII; and

(iv)   not commit waste.

(b)   **Tenant's Failure to Repair.**  If Tenant refuses or neglects to commence repairs within ten (10) days of written notice from Landlord, or if nature is such that repairs cannot be reasonably commenced within said ten (10) days, such additional time as may be reasonably necessary to commence, or fails to complete repairs promptly and adequately, Landlord may, but shall not be required to, make or complete said repairs and Tenant shall pay the cost thereof to Landlord within thirty (30) days after receipt of appropriate documentation thereof.

(c)   **Landlord's Repairs.**  Landlord shall be responsible for keeping the Common Areas of the Building reasonably clear of litter and snow, maintaining any plantings and landscaped areas and keeping Common Areas reasonably lighted at times when substantially all commercial spaces of the Building are open for business.  Landlord shall make the repairs, maintenance and replacements necessary to maintain the Building in a condition consistent in quality with other comparable buildings in the Raleigh, North Carolina area.   This repair, maintenance and replacement shall include the roof, foundation, exterior walls, interior structural walls, and all structural components, as well as all mechanical, electrical, HVAC, and plumbing serving the Building (but excluding any maintenance, repairs or replacements which are the responsibility of Tenant under Section 7.03(a)(i).

(d)   **Time for Repairs.**   Repairs or replacements required under Sections 7.03(a) or 7.03(c) shall be made within a commercially reasonable time (depending on the nature of the repair or replacement needed) after receiving notice or having actual knowledge of the need for a repair or replacement.  Tenant agrees to promptly notify Landlord of the need of any repairs of which Tenant has actual knowledge and which are Landlord's obligation under the terms of this Lease.  In the event Tenant fails to so notify Landlord, Tenant shall indemnify and save harmless Landlord, its successors and assigns from and against any liability arising out of or in connection with the failure of Tenant to so notify Landlord giving Landlord the opportunity to make prompt repairs.  In the event that the replacements or repairs are not performed by the Landlord within a commercially reasonable time (depending on the nature of the repairs or replacements needed), Tenant may at its discretion, after notice to Landlord, have the replacement or repair performed and seek reimbursement from Landlord.

(e)   **Surrendering the Premises.**   Upon the Expiration Date or earlier termination of this Lease as provided herein, Tenant shall surrender the Premises to Landlord in the same condition that the Premises were in on the Commencement Date except for:

(i)   ordinary wear and tear;

(ii)   damage by the elements, fire, and other casualty unless Tenant would be required to repair under paragraph 7.03(a);

(iii)   condemnation;

(iv)   damage arising from any cause not required to be repaired or replaced by Tenant; and

(v)   alterations as permitted by this Lease unless Landlord requests their removal.

(f)   **Damage or Destruction.**  The provisions of this Article VII shall not apply in the case of damage or destruction by fire or other casualty or by Eminent Domain, in which events the obligations of Landlord shall be controlled by Article XII.

_____ Please Initial
_____ Please Initial
_____ Please Initial

## ARTICLE VIII
## NEGATIVE OBLIGATIONS

**8.01    Assignment and Subleasing.**

(a)    **Consent Required.** Tenant shall not transfer, mortgage, encumber, assign, or sublease all or part of the Premises without Landlord's advance written consent. Landlord's consent to any assignment or sublease shall not be unreasonably withheld, conditioned or unduly delayed.

(b)    **Reasonableness.** The Landlord's consent shall not be considered unreasonably withheld if:

    (i)    the proposed assignee's financial responsibility does not meet the same criteria Landlord uses to select comparable Building tenants;

    (ii)   the proposed subtenant's or assignee's business is not suitable for the Building, considering the business of the other tenants and the Building's prestige; or

    (iii)  the proposed use is inconsistent with the use permitted by Article II.

(c)    **Affiliates.** Notwithstanding Section 8.01(a), (b), and (c), Tenant may assign or sublease part or all of the Premises with Landlord's consent to:

    (i)    any present or future corporation or partnership that controls, is controlled by, or is under common control with, Tenant upon providing the relevant documentation to Landlord.

(d)    **Conditions.** Any subleases and assignments by Tenant are also subject to the following:

    (i)    The terms of this Lease;

    (ii)   The term shall not extend beyond the Term stated in this Lease;

    (iii)  Tenant shall remain liable for all Lease obligations in the event of a sublease and the assignee shall remain liable for all Lease obligations in the event of an assignment;

    (iv)   Consent to one sublease or assignment does not waive the consent requirements for future assignments or subleases; and

    (v)    Except as to any assignment or sublease pursuant to Section 8.01(d) (i) or (ii), any consideration received by Tenant from an assignment or sublease that exceeds the amount Tenant must pay to the Landlord ("Excess Consideration"), which amount is to be prorated where a part of the Premises is subleased or assigned, shall also be paid to Landlord. Tenant shall pay this Excess Consideration to Landlord at the end of each calendar month during which Tenant collects any Excess Consideration. Each payment shall be sent with a detailed statement showing the total consideration paid by the subtenant or assignee. Landlord shall have the right to audit Tenant's books and records to verify the accuracy of the detailed statement.

## ARTICLE IX
## OUTDOOR SEATING AREA

**9.01    Outdoor Seating Area.** Provided Tenant obtains all the necessary governmental permits and approvals and written approval of its outdoor seating plan from Landlord, Tenant may install for the exclusive use by its customers two and four seat outdoor tables in a location designated by Landlord (the "Outdoor Seating Area"), subject to the following terms and conditions: (i) Tenant shall insure the Outdoor Seating Area and indemnify Landlord as if the Outdoor Seating Area was part of the Leased Premises. Tenant shall provide Landlord with a certificate of insurance documenting that Tenant's insurance policies as described in Article 10 also cover the permissible Outdoor Seating Area; (ii) Tenant shall open the Outdoor Seating Area for business only during those hours when the Leased Premises are open for business; (iii) Tenant shall install and maintain, at its sole cost and expense, all furniture, equipment, and lighting for the Outdoor Seating Area; (iv) Tenant acknowledges and agrees to the following:

1.    The furniture shall meet high standards of quality and appearance consistent with a first-class operation;

2.    No furniture shall be used or placed in the Outdoor Seating Area until its design, size, color, position, and method of attachment or installation are first approved by Landlord in writing;

3.    Tenant shall be solely responsible for any destruction, damage, theft, or vandalism of, or to, the furniture in the Outdoor Seating Area;

4.    Tenant shall not restrict access to the Building, other tenants' space in the Building, or pedestrian or vehicular flow through the Common Areas or public right of ways;

5.    Tenant shall not erect or place any canopy or other enclosure or covering on the Outdoor Seating Area without Landlord's prior written approval;

---

14

6.      Tenant shall not permit any unreasonably loud music or other similar sounds to be heard in the Outdoor Seating Area;

7.      Tenant shall not permit loitering in the Outdoor Seating Area by persons who are not customers/patrons of Tenant; and

8.      Tenant shall police and maintain the Outdoor Seating Area in good condition and repair and free of all litter.

In the event either Landlord or Tenant receives one (1) or more complaints from any governmental agency (e.g. police, health, fire or building department) at any time, Landlord shall have the right to immediately and forever revoke Tenant's right to the Outdoor Seating Area.  If Landlord revokes Tenant's right to the Outdoor Seating Area as permitted above, Tenant shall immediately discontinue the outdoor seating and remove all of the tables and chairs, etc.

### ARTICLE X
### INSURANCE AND WAIVER OF SUBROGATION

**10.01   Insurance.**

(a) **Landlord's Building Insurance.**  Landlord shall keep the Building, improvements and Common Areas insured against damage and destruction by fire, earthquake, vandalism, and other perils under a hazard insurance policy, which insurance shall be selected, purchased and owned by Landlord in an amount Landlord deems adequate.  Nothing herein or in the Landlord's policy shall be deemed to require Landlord to rebuild the Building or the Premises in the event of a covered loss.

(b) **Property Insurance.**  Tenant shall, during the entire term hereof, keep in full force and effect, at its sole cost and expense, commercial "all risks" insurance, including fire and other hazard insurance, and insurance against sprinkler leakage or malfunction and water damage to the Premises and smoke/fire/water damage to adjacent tenants' property, and against vandalism and malicious mischief, covering Tenant's furniture, trade fixtures, furnishings, equipment, windows, doors, inventory, contents in and upon the Premises in an amount to cover one hundred percent (100%) of the replacement cost of the same. Tenant shall also keep any Tenant Improvements or Alterations made to the Premises by or at Tenant's request or improvements, fixtures or equipment paid for by the Landlord for the use of Tenant insured to cover one hundred percent (100%) of the replacement cost of the same   Tenant's property insurance shall also provide for business interruption/extra expense coverage in sufficient amounts to cover the Base Rent and Additional Rent payments under this Lease.  Landlord shall not be an insurer of Tenant's property nor shall Landlord be liable for damage or loss to the Tenant's business or for loss of income due to damage or casualty to the Premises due to any casualty, including but not limited to fire, wind, hurricane, tornado, earthquake, flood, water from any source (including but not limited to the roof, gutters, downspouts, storm drains and sewer), or any other hazard, natural or otherwise.

(c) **Liability Insurance.**  Tenant agrees to carry, at its own expense, throughout the term of this Lease comprehensive public liability insurance covering the Premises and Tenant's use thereof, with companies and in a form reasonably satisfactory to Landlord, with minimums of $1,000,000.00 per occurrence, on account of bodily injuries or death, and $3,000,000.00 aggregate, with $500,000.00 coverage for property damage claims, and to deposit copies of certificates thereof with Landlord prior to the date of any use or occupancy of the Premises by Tenant, and upon each renewal thereof; said policies shall name the Landlord as an additional insured and shall protect Tenant and Landlord, as their interests may appear.  This policy must be written on an occurrence basis.  Should Tenant fail to carry such public liability insurance, Landlord may at its option (but shall not be required so to do) cause public liability insurance as aforesaid to be issued, and in such event Tenant agrees to pay the premium for such insurance promptly upon Landlord's demand.  Such liability insurance policy or policies shall bear endorsements to the effect that the insurer agrees to notify Landlord not less than thirty (30) days in advance of material modification or cancellation thereof.

Landlord agrees to carry throughout the term of this Lease public liability insurance with respect to the common areas at the Building with a minimum combined coverage for bodily injury and property damage of _____.

(d) Tenant agrees to comply with all requirements and recommendations of Landlord's and Tenant's insurance companies and any rating bureau or similar organization, including maintaining and servicing fire extinguishers.

(e) **Workers Compensation and Employee Liability Insurance**. Tenant shall be required to obtain coverage under the Workers Compensation laws of the State of North Carolina and Employers Liability coverage subject to a limit of no less than $100,000 each employee, $100,000 each accident, $500,000 policy limit.

(f) **Umbrella Liability Insurance.**  Tenant shall maintain umbrella liability insurance at not less than a $3,000,000 limit providing excess coverage over all limits and coverage noted in Sections 10.01(c) and 10.01(d) above.  This policy shall be written on an occurrence basis.

(g) **Waiver of Subrogation.**  Anything in this Lease to the contrary notwithstanding, Landlord and Tenant hereby waive and release each other of and from any and all right of recovery, claim, action or cause of action, against each other, their agents, officers and employees, for any loss or damage that may occur to the Premises, improvements to the Building, or personal property within the Building, by reason of fire or the elements, regardless of cause or origin, including negligence of Landlord or Tenant and their agents, officers, employees or others for whom such party may be responsible; provided, however, that this release shall be applicable and in force and effect only with respect to loss or damage occurring during such time as the releasor's policies shall contain a clause or endorsement to the effect that any such release shall not adversely affect or impair said policies or prejudice the right of the releasor to recover thereunder.  Landlord and Tenant agree immediately to give their respective insurance companies which have issued policies of insurance covering all risk of direct physical loss, written notice of the terms of the mutual waivers contained in this Section, and to have the insurance policies properly endorsed, if necessary, to

---

15

_____ Please Initial
_____ Please Initial
_____ Please Initial

prevent the invalidation of the insurance coverage by reason of the mutual waivers.  The waiver does not apply to claims caused by a party's willful misconduct.  If extra cost shall be charged for obtaining the waiver in the policy, each party shall advise the other thereof and of the amount of the extra cost, and the other party, at its election, may pay the same, but shall not be obligated to do so (but if not paid said clause may be omitted).

If despite a party's best efforts it cannot find an insurance company meeting the criteria in Section 10.01(h) that will give the waiver at reasonable commercial rates, then it shall give notice to the other party within thirty (30) days after the Commencement Date.  The other party shall then have thirty (30) days to find an insurance company that will issue the waiver.  If the other party also cannot find such an insurance company, then both parties shall be released from their obligations to obtain the waiver.

(h)  **Increase in Insurance.**  If due to Tenant's particular use of the Premises, Landlord's insurance rates are increased, Tenant shall pay the increased amount to Landlord, as Additional Rent, within ten (10) days of receiving a request for payment and appropriate documentation thereof.  In addition, the amounts of coverage required by this Lease are subject to review by Landlord at the end of each Adjustment Period.  At each review, if necessary to maintain the same level of coverage that existed on the Commencement Date, the amounts of coverage shall be increased to the lesser of:

      (i)  the amounts of coverage carried by prudent landlords and tenants of comparable office buildings in the Raleigh-Durham, North Carolina area; or

      (ii)  twenty-five percent (25%) higher than the previous insurance amounts.

**(i)  Insurance Criteria.**  Insurance policies required by this Lease shall:

      (i)  be issued by insurance companies licensed to do business in the state of North Carolina with general policyholder's ratings of at least A and a financial rating of at least XI in the most current *Best's Insurance Reports* available on the date of this Lease;

      (ii)  name the non-procuring party as an additional insured as its interest may appear (other landlords or tenants may also be added as additional insurers in a blanket policy);

      (iii)  provide that the insurance not be canceled or materially changed in the scope or amount of coverage unless thirty (30) days' advance notice is given to the non-procuring party;

      (iv)  be primary policies - not as contributing with, or in excess of, the coverage that the other party may carry;

      (v)  be permitted to be carried through a "blanket policy" or "umbrella" coverage;

      (vi)  have property deductibles not greater than $5,000; and

      (vii)  be maintained during the entire Term.

(j)  **Evidence of Insurance.**  By the Commencement Date and upon each renewal of its insurance policies, Tenant shall give copies of certificates of insurance to Landlord.  The certificate shall specify amounts, types of coverage, the waiver of subrogation, and the insurance criteria listed in Section 10.01(h).  The policies shall be renewed or replaced and maintained by Tenant.  If Tenant fails to give the required certificate within ten (10) days after the notice of demand for it, Landlord may obtain and pay for that insurance, but is not obligated to do so, and receive reimbursement from the party required to have the insurance within ten (10) days from demand therefore.  Notwithstanding anything in this Lease, failure to furnish the required certificates, failure tor carry the required insurance, or failure to reimburse Landlord as required hereunder shall be a material breach of this Lease and shall constitute an event of default.

**10.02   Indemnification.**

    (a)  **Tenant's Indemnity.**  Tenant indemnifies, defends, and holds Landlord, its officers, shareholders, directors, agents, successors and assigns, harmless from and against any and all claims, actions, damages, liability and expense, including but not limited to those:

      (i)  for personal injury, death, or property damage;

      (ii)  for incidents occurring in or about the Premises, Common Areas of the Building; and

      (iii)  caused, in whole or in part, by any act or omission, negligence or willful misconduct of Tenant, its agents, contractors, employees, servants, lessees, concessionaires or invitees.

In case Landlord shall, without fault on its part, be made a party to any litigation commenced by or against Tenant, then Tenant shall protect and hold Landlord harmless and shall pay any and all costs and expenses incurred by Landlord, including without limitation, court costs and reasonable attorney's fees in connection with such litigation, including the enforcement of any of its rights or remedies under this lease.

The provisions of this Section shall survive the expiration or termination of this Lease with respect to any claims or liability occurring prior to such expiration or termination.

---

16

    _____ Please Initial
    _____ Please Initial
    _____ Please Initial

When the claim is caused by the joint negligence or willful misconduct of Tenant and Landlord or Tenant and a third party unrelated to Tenant, except Tenant's agents, employees, or invitees, Tenant's duty to defend, indemnify, and hold Landlord harmless shall be in proportion to Tenant's allocable share of the joint negligence or willful misconduct.

(b)   **Landlord's Indemnity.**  Landlord indemnifies, defends, and holds Tenant, its officers, shareholders, directors, agents, successors and assigns, harmless from and against any and all claims, actions, damages, liability and expense, including but not limited to those:

> (i)   for personal injury, death, or property damage;
>
> (ii)   for incidents occurring in or about the Common Areas of the Building; and
>
> (iii)   caused, in whole or in part, by the negligence or willful misconduct of Landlord, its agents, employees, or invitees.

When the claim is caused by the joint negligence or willful misconduct of Landlord and Tenant or Landlord and a third party unrelated to Landlord, except Landlord's agents, employees, or invitees, Landlord's duty to defend, indemnify, and hold Tenant harmless shall be in proportion to Landlord's allocable share of the joint negligence or willful misconduct.

(c)   **Release of Claims.**  Notwithstanding Section 10.02(a) and (b), the parties release each other from any claims either party ("Injured Party") has against the other to the extent the claim is covered by the Injured Party's insurance.

**10.03**   **Limitation of Landlord's Liability.**

(a)   **Transfer of Premises.**  If the Building is sold or transferred, voluntarily or involuntarily, Landlord's Lease obligations and liabilities accruing after the transfer shall be the sole responsibility of the new owner and the Tenant's funds in the hands of Landlord, such as the Security Deposit, if any, shall be given to the new owner.

(b)   **Liability for Judgments.**  If Landlord, its employees, officers, directors or partners are ordered to pay Tenant a monetary or nonmonetary judgment because of Landlord's default, Tenant's sole remedy to satisfy the judgment shall be to execute against Landlord's interest in the Building and Land.  Under no circumstance will Landlord, or its officers, directors, shareholders, partners or employees be personally liable for any judgment and no other assets of the Landlord, its officers, directors, shareholders, partners or employees, if any, shall be subject to levy, execution or other judicial process for the satisfaction of Tenant's claim.

*ARTICLE XI*
**ENVIRONMENTAL & OTHER GOVERNMENTAL COMPLIANCE**

(a)   Tenant covenants and agrees that the Premises will, at all times during Tenant's use or occupancy thereof, be kept and maintained by so as to comply with all now existing or hereafter enacted or issued statutes, codes, laws, rules, ordinances, orders, permits, and bodies applicable to the Premises pertaining to environmental matters, or regulating, prohibiting or otherwise having to do with asbestos, radon, PCB's, and all other toxic radioactive, or hazardous wastes or materials, including, but not limited to, the Federal Clean Air Act, the Federal Water Pollution Control Act, and the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as from time to time amended (all hereafter collectively called "Laws").  No material shall be installed in the Premises, or anywhere else within the Building or Site, by Tenant or any employee, agent, or contractor of Tenant which contains any asbestos or other toxic or hazardous waste or substance except as may be used in minimal amounts such as standard cleaning or janitorial materials which shall be used in compliance with all Laws or which causes, or could cause the Premises or the remainder of the Building or Site to be in violation of any Laws (1) when such material is installed; (2) while such material remains thereon; or (3) when such material is disturbed or removed.

(b)   Tenant shall hold Landlord free, harmless, and indemnified from any penalty, fine, claim, demand, liability, costs, or charge whatsoever which Landlord shall incur, or which Landlord would otherwise incur, by reason of Tenant's failure to comply with this Section, including, but not limited to:  (1) the cost of bringing the Building or Site into compliance with all Laws; (2) the reasonable cost of all appropriate tests and examinations of the Building or Site to confirm that the same has been brought into compliance with all Laws; and (3) the reasonable fees and expenses of Landlord' attorneys, engineers, and consultants incurred by Landlord in enforcing and confirming compliance with this Section.

(c)   Upon reasonable written notice to Tenant, Landlord and their engineers, technicians, and consultants (collectively the "Auditors") may, from time to time as Landlord deem appropriate, conduct periodic tests and examinations ("Audits") of the Premises to confirm and monitor Tenant's compliance with this Section.  Such Audits shall be conducted in such a manner as to minimize the interference with Tenant's permitted activities on the Premises; however, in all cases, the Audits shall be of such nature and scope as shall be reasonably required by then existing technology to confirm Tenant's compliance with this Section.  Tenant shall fully cooperate with the Auditors in the conduct of such Audits.  The cost of such Audits shall be paid by Landlord unless an Audit shall disclose a material failure of Tenant to comply with this Section, in which case the cost of such Audit, and the cost of all subsequent Audits made during the Lease Term until the violation is remedied, including the Audit to evidence the complete remediation

17

(not to exceed two (2) such Audits in any consecutive twelve (12) month period), shall be paid for by Tenant within thirty (30) days of receipt by Tenant of invoices for such audits.

(d)      Tenant shall also have the right to conduct Audits of the Premises to confirm and monitor Landlord's compliance with this Section. Landlord shall fully cooperate with Tenant's Auditors in the conduct of such Audits. The cost of such Audits shall be paid by Tenant unless an Audit shall disclose a material failure of Landlord to comply with this Section, in which case the cost of such Audit, and the cost of all subsequent Audits made during the Lease Term until the violation is remedied, including the Audit to evidence the complete remediation (not to exceed two (2) such Audits in any consecutive twelve (12) month period), and within thirty (30) days thereafter shall be paid for by Landlord within thirty (30) days of receipt by Landlord of invoices for such audits. In the event the Premises do not comply with issued statutes, codes, laws, regulations, rules, ordinances, orders, permits, and bodies applicable to environmental matters, provided the noncompliance is not created by the use of Tenant or its employees, officers, partners, contractors, guests or invitees, Landlord shall be responsible for all costs associated with bringing said Premises into compliance.

(e)      Provided, however, the foregoing covenants and undertakings of Tenant contained in this Section shall not apply to any condition or matter constituting a violation of any Law: (1) which existed prior to the commencement of Tenant's use or occupancy of any portion of the Premises, and was not caused, in whole or in part, by Tenant or Tenant's agents, employees, officers, partners, contractors, or invitees, or (2) to the extent such violation is caused by, or results from, the acts or negligence of Landlord, or other tenants in the Building, or Landlord's or such other tenants' employees, officers, partners, contractors, guests or invitees. Further provided that Landlord's liability shall be limited as set forth in Section 10.03.

(f)      The covenants contained in this Section shall survive the expiration or termination of this Lease, and shall continue for so long as either party, or its successors and assigns, may be subject to any expense, liability, charge, penalty, or obligation against which the other party has agreed to indemnify them under this Section.

## ARTICLE XII
## LOSS OF PREMISES

**12.01    Damages.**

(a)    **Definition.** "Relevant Space" means:

   (i)    the Premises, excluding Tenant's fixtures installed by or at the request of Tenant;

   (ii)    ability to use the Premises for the purposes intended; and

   (iii)    any part of the Building that provides essential services to the Premises.

(b)    **Notice of Loss; Cooperation.** As required by Section 7.03(d), Tenant shall promptly notify Landlord by (i) speaking directly with David Joyner or Robert Chappell and (ii) providing written notice of any damage caused to the Premises by fire or other casualty. In the event of damage to the Premises as a result of fire or other casualty, Tenant shall fully cooperate with any insurance or criminal investigation of the event or damage and a failure of the Tenant to fully cooperate shall constitute a material breach of this Lease. If as the result of any investigation it is determined that the cause of the damage was the result of an act or omission on the part of Tenant, nothing contained in this Lease shall be deemed a waiver by Landlord of Tenant's negligence or a legal or equitable estoppel that could prevent Landlord's insurer from seeking reimbursement or contribution damages from the Tenant or from the Tenant's insurer. In the event of a casualty loss, Landlord and Tenant agree to fully cooperate with one another and the other party's insurance company in order to process any insurance claims.

(c)    **Repair of Damage.** If the Relevant Space is damaged in part or whole from any cause and the Relevant Space can be substantially repaired and restored within one hundred eighty (180) days from the date of the damage using standard working methods and procedures, Landlord shall at its expense promptly and diligently   repair and restore the Relevant Space to substantially the same condition as existed before the damage. This repair and restoration shall be made within one hundred eighty (180) days from the date of the damage unless the delay is due to causes beyond Landlord's reasonable control. In the event the Relevant Space is damaged and Landlord elects to make the necessary repairs and/or restoration which results in abatement of rent (as provided for below), Landlord shall be entitled to receive all benefits for loss of rental income available under any insurance coverage obtained by the parties pursuant to this Lease and Tenant shall be entitled to all benefits for los of business revenues available under its insurance coverage.

If the Relevant Space cannot be repaired and restored within the one hundred eighty (180) day period, then either party, may, within thirty (30) days after determining that the repairs and restoration cannot be made within one hundred eighty (180) days, cancel the Lease by giving notice to the other party. Nevertheless, if the Relevant Space is not repaired and restored within one hundred eighty (180) days from the date of the damage, then Tenant may cancel the Lease at any time within thirty (30) days after the one hundred eightieth (180th) day. Tenant shall not be able to cancel this Lease if its willful misconduct causes the damage unless Landlord is not promptly and diligently repairing and restoring the Relevant Space.

(d)    **Determining the Extent of Damage.** If the parties cannot agree in writing whether the repairs and restoration will take more than one hundred eighty (180) days to make, then the determination will be made by an architect selected by Landlord, in its sole discretion.

18

_____ Please Initial
_____ Please Initial
_____ Please Initial

(e) **Abatement.** Unless the damage is caused by the willful misconduct, fault or negligence of Tenant, its employees, agents, customers or guests, the Base Rent and Additional Rent shall abate in proportion to that part of the Premises that is unfit for use in Tenant's business. The abatement shall consider the nature and extent of interference to Tenant's ability to conduct business in the Premises and the need for access and essential services. The abatement shall continue from the date the damage occurred until ten (10) business days after Landlord completes the repairs and restoration to the Relevant Space or the part rendered unusable and notice to Tenant that the repairs and restoration are completed, or until Tenant again uses the Premises or the part rendered unusable, whichever is first. Landlord shall not in such case have any liability for losses claimed by Tenant and the abatement shall be the sole measure of compensation from Landlord to Tenant for loss of use of the Relevant Space or for any inconvenience or loss of business occasioned by the damage, destruction, repair or restoration.

(f) **Tenant's Property.** Notwithstanding anything else in this Article XII, Landlord is not obligated to repair or restore damage to Tenant's trade fixtures, furniture, equipment, or other personal property, or any Tenant improvements, unless caused by Landlord's negligence or misconduct.

(g) **Landlord's Election to Rebuild.** If:

    (i) more than twenty-five percent (25%) of the Premises or the Building is damaged and the Landlord decides not to repair and restore the Premises and/or Building;

    (ii) any mortgagee of the Building shall not allow adequate insurance proceeds for repair and restoration;

    (iii) the damage is not covered by Landlord's insurance; or

    (iv) the Lease is in the last twelve (12) months of its Term

then Landlord may cancel this Lease. To cancel, Landlord must give notice to Tenant within thirty (30) days after the Landlord knows of the damage. The notice must specify the cancellation date, which shall be at least thirty (30) but not more than sixty (60) days after the date notice is given.

(h) **Cancellation.** If either party cancels this Lease as permitted above, then this Lease shall end on the day specified in the cancellation notice. The Base Rent, Additional Rent, and other charges shall be payable up to the cancellation date and shall account for any abatement. Landlord shall promptly refund to Tenant any prepaid, unaccrued Base Rent and Additional Rent, accounting for any abatement, plus Security Deposit, if any, less any sum then owing by Tenant to Landlord.

**12.02   Condemnation.**

(a) **Definitions.** The terms "eminent domain," "condemnation," "taken," and the like in Section 12.02 include takings for public or quasi-public use and private purchases in place of condemnation by any authority authorized to exercise the power of eminent domain.

(b) **Entire Taking.** If the entire Premises or the portions of the Building required for reasonable access to, or the reasonable use of, the Premises are taken by eminent domain, or conveyed under threat of condemnation, this Lease shall automatically end on the earlier of:

    (i) the date title vests; or

    (ii) the date Tenant is dispossessed by the condemning authority.

(c) **Partial Taking.** If the taking of a part of the Premises materially interferes with Tenant's ability to continue its business operations in substantially the same manner and space then Tenant may terminate this Lease on the earlier of:

    (i) the date when title vests;

    (ii) the date Tenant is dispossessed by the condemning authority; or

    (iii) sixty (60) days following notice to Tenant of the date when vesting or dispossession is to occur.

If there is a partial taking as defined above, and this Lease continues, then the Lease shall end as to the part taken and the Base Rent and Additional Rent shall abate in proportion to the part of the Premises taken and Tenant's pro rata share shall be equitably reduced.

If any part of the Building, other than the Premises or any part of the Building not constituting a substantial part of the Premises, or any part of this land on which the Building and Premises is located (the "Site") shall be so taken or condemned, or if the grade of any street or alley adjacent to the Site is changed by any public authority and such taking or change of grade makes it necessary or desirable to substantially remodel or restore the Building, Landlord shall have the right to cancel this Lease upon not less than ninety (90) days' notice prior to the date of cancellation designated in the notice. No money or other consideration shall be payable by Landlord to Tenant for the right of cancellation, and Tenant shall have no right to share in the condemnation award or in any judgment for damages

_____ Please Initial
_____ Please Initial
_____ Please Initial

caused by the change of grade.

(d) **Termination by Landlord.** If title to a part of the Building other than the Premises is condemned, and in the Landlord's reasonable opinion, the Building should be restored in a manner that materially alters the Premises, Landlord may cancel this Lease by giving notice to Tenant. Cancellation notice shall be given within sixty (60) days following the date title vested. This Lease shall end on the date specified in the cancellation notice, which date shall be at least thirty (30) days but not more than ninety (90) days after the notice is given.

(e) **Rent Adjustment.** If the Lease is canceled as provided in Sections 12.02(b), (c), or (d), then the Base Rent, Additional Rent, and other charges shall be payable up to the cancellation date, and shall account for any abatement. Landlord, considering any abatement, shall promptly refund to Tenant any prepaid, unaccrued Base Rent and Additional Rent plus Security Deposit, if any, less any sum then owing by Tenant to Landlord.

(f) **Repair.** If the Lease is not canceled as provided for in Sections 12.02(b), (c), or (d), then Landlord at its expense shall promptly repair and restore the Premises to the condition that existed immediately before the taking, except for the part taken, to render the Premises a complete architectural unit, but only to the extent of the condemnation award received for the damage

(g) **Awards and Damages.** Landlord and Tenant shall apportion any award or damages paid in accordance with statutory law. Notwithstanding anything else in this Section 12.02(g), Tenant may claim and recover from the condemning authority a separate award for Tenant's moving expenses, business dislocation damages, Tenant's personal property and fixtures, the unamortized costs of leasehold improvements paid for by Tenant, excluding the Landlord's Improvements, and any other award that would not substantially reduce the award payable to Landlord. Each party shall seek its own award, as limited by this provision, at its own expense, and neither shall have any right to the award made to the other.

(h) **Temporary Condemnation.** If part or all of the Premises are condemned for a limited period of time ("Temporary Condemnation"), this Lease shall remain in effect. The Base Rent and Additional Rent and Tenant's obligations for the part of the Premises taken shall abate during the Temporary Condemnation in proportion to the part of the Premises that Tenant is unable to use in its business operations as a result of the Temporary Condemnation. Landlord shall receive the entire award for any Temporary Condemnation.

### ARTICLE XIII
### DEFAULT

**13.01   Tenant's Default.**

(a) **Defaults.** Each of the following constitutes a default ("Default"), unless the same are due to Force Majeure or Acts of God:

    (i)   Tenant's failure to pay Base Rent and/or Additional Rent within five (5) days after it is past due and payable;

    (ii)   Tenant's failure to pay Base Rent and/or Additional Rent by the due date, at any time during a calendar year in which Tenant has already received two (2) notices of its failure to pay Base Rent and/or Additional Rent by the due date;

    (iii)   Tenant's failure to perform or observe any other Tenant obligation after a period of twenty (20) days or the additional time, if any, that is reasonably necessary to promptly and diligently cure the failure, after it receives notice from Landlord setting forth in reasonable detail the nature and extent of the failure and identifying the applicable Lease provision(s);

    (iv)   Tenant's abandoning or vacating the Premises (it being agreed that absence from the Premises for ten (10) consecutive days after rent has become delinquent or the removal of substantially all of Tenant's possessions will create a conclusive presumption of abandonment);

    (v)   Tenant's failure to vacate or stay any of the following within sixty (60) days after they occur:

        (1)   a petition in bankruptcy is filed by or against Tenant;

        (2)   Tenant is adjudicated as bankrupt or insolvent;

        (3)   a receiver, guardian, trustee, or liquidator is appointed for all or a substantial part of Tenant's property; or

        (4)   Tenant makes an assignment for the benefit of creditors.

**13.02   Landlord's Remedies.**

(a) **Remedies.** Landlord in addition to the remedies given in this Lease or under the law (legal or equitable), may (without being deemed guilty in any manner of trespass) do any one or more of the following if Tenant commits a

_____ Please Initial
_____ Please Initial
_____ Please Initial

Default under Section 13.01:

(i)     end this Lease, and Tenant shall then immediately surrender the Premises to Landlord;

(ii)    enter and take possession of the Premises, either with or without process of law, and remove Tenant, with or without having ended the Lease; and

(iii)   alter locks and other security devices at the Premises (to which Tenant hereby expressly consents in the event of it's failure to cure a default or breach of this Lease).

In the case of Tenant's default or breach of this Lease, Tenant hereby expressly waives any "notice to quit possession" and every other formality. Tenant further waives claims for damages by reason of Landlord's reentry, repossession, or alteration of locks or other security devices and for damages by reason of any legal process.

In the event Tenant abandons personal property at the Premises, which would include Tenant's failure to remove all of its personal property within twenty (20) days after the termination or expiration of the Lease, or Tenant defaults under the terms of this Lease for nonpayment of rent or any other sums of money due under this Lease, all personal property of Tenant, including but not limited to its furniture, appliances, inventory and decorations, shall remain at the Premises and shall become the property of Landlord. Notwithstanding the foregoing, in the event Landlord elects to sell said personal property, Landlord may do so in any commercially reasonable fashion and shall retain from the sales proceeds (i) an amount equal to any outstanding indebtedness from Tenant to Landlord, (ii) all of its reasonable expenses in connection with such sale and any storage or moving costs incurred by Landlord in connection with said personal property and (iii) such other sales proceeds as may be permitted by law, and shall remit the balance, if any, to Tenant. Tenant shall be charged with any resulting damages and costs of removal of the personal property. Landlord may also elect to store the property in a public warehouse or at another place of its choosing at Tenant's expense or for Tenant's account.

(b)   **No Surrender.**  Landlord's exercise of any of its remedies or its receipt of Tenant's keys shall not be considered an acceptance or surrender of the Premises by Tenant. A surrender must be agreed to in writing signed by both parties.

(c)   **Rent.**  If Landlord terminates this Lease or Tenant's right to possess the Premises because of a Default, Landlord may hold Tenant liable for Base Rent, Additional Rent, and other indebtedness accrued to the date the Lease expires or is terminated. Tenant shall also be liable for the Base Rent, Additional Rent and other indebtedness that otherwise would have been payable by Tenant during the remainder of the Term had there been no default, reduced by any sums Landlord receives by reletting the Premises during the Term.

(d)   **Other Expenses.**  Tenant shall also be liable for that part of the following sums paid by Landlord and attributable to that part of the Term ended due to Tenant's Default:

(i)     reasonable broker's fees incurred by Landlord for reletting part or all of the Premises prorated for that part of the reletting Term ending concurrently with the then current Term of this Lease;

(ii)    the cost of removing and storing Tenant's property, as well as altering the locks and/or security devises at the Premises;

(iii)   the cost of repairs, alterations, and remodeling necessary to put the Premises in a condition reasonably acceptable to a new Tenant; and

(iv)    other necessary and reasonable expenses incurred by Landlord in enforcing its remedies, including, without limitation, court costs, service fees, and reasonable attorneys fees.

Regardless of whether Landlord ends the Lease upon Tenant's default, in addition to the foregoing expenses to be paid by Tenant, Tenant will be charged (i) a Court Paper Administration Fee of Two Hundred Fifty and 00/100 Dollars ($250.00) each time court papers are filed by Landlord against Tenant to enforce the terms of this Lease and (ii) an administrative charge of Two Hundred Fifty and 00/100 Dollars ($250.00) each time locks and/or security devises at the Premises are altered..

(e)   **Payment.**  Tenant shall pay the sums due in Sections 13.02(c) and (d) within thirty (30) days of receiving Landlord's proper and correct invoice for the amounts.

(f)   **Reletting.**  Landlord may relet for a shorter or longer period of time than the Lease Term and make any necessary repairs or alterations. Landlord may relet on any reasonable terms including a reasonable amount of free rent.

(g)   **Acceleration.**  Should Landlord at any time terminate this Lease for any breach or default, in addition to any other remedies Landlord may have, Landlord may accelerate all future Lease payments, including those expenses incurred by Landlord pursuant to Section 13.02(d) above, and the same shall be immediately due and payable.

13.03   **Self-Help.**  If Tenant defaults, Landlord may, without being obligated and without waiving the Default, cure the Default, and may enter the Premises to do so. Tenant shall pay Landlord, upon demand, as Additional Rent, all costs, expenses and disbursements incurred by Landlord.

13.04   **Notice.** Landlord shall not be in default under this Lease unless and until Tenant has given written notice, by registered

21

_____ Please Initial
_____ Please Initial
_____ Please Initial

or certified mail, of the default by the Landlord to the Landlord and to the holder or holders of any mortgage or deed of trust covering the Premises of which Landlord has notified Tenant, and shall have given said Landlord and holder or holders thirty (30) days from the date of its receipt of such notice to cure such default, including, for such holder or holders, time to get possession of the Premises by an expeditious trustee's sale or foreclosure action, if this should be necessary to effect such cure.

**13.05   Survival.**   The remedies permitted by this Article XIII and the parties' indemnities in Section 10.02 shall survive the Expiration Date or earlier termination of this Lease.

***ARTICLE XIV***
**NON DISTURBANCE**

**14.01   Subordination.**

(a)   **Mortgages.**   Subject to Section 14.01(b), this Lease is subordinate to prior or subsequent mortgages covering the Building.  Upon written request or notice by Landlord, Tenant agrees to subordinate this Lease to the lien of any mortgages in any amount or amounts on all or any part of the Building and to all ground or underlying leases which exist or may hereafter be executed affecting such land and buildings, or either thereof, of which the Premises are a part, or on or against Landlord's interest or estate therein, or any part of or interest in any of the foregoing, (and in all cases including all extensions, renewals, amendments and supplements to any ground or underlying lease or mortgage); provided that the mortgagee or trustee named in any such mortgage or the lessor under any ground or underlying lease shall agree to recognize the Lease of Tenant in the event of foreclosure of any such mortgage or termination of any such ground or underlying lease if Tenant is not in default under the Lease.  Tenant covenants and agrees to execute and deliver, upon demand, such further instruments evidencing such subordination of this Lease to any such ground or underlying lease and to the lien of any such mortgage as may be required by the Landlord within ten (10) days of demand therefor.  Notwithstanding anything hereinabove contained, in the even the holder of any such mortgage or the landlord under any such ground or underlying lease shall at any time elect to have this Lease constitute a prior or superior lien to its mortgage or lease, then and in such event upon any such mortgageholder or landlord notifying Tenant to that effect, this Lease shall be deemed prior and superior in lien to such mortgage or lease as the case may be, irrespective of whether this Lease is dated prior to or subsequent to the date of such mortgage or lease.

If Landlord enters into one or more concurrent or successive mortgages or ground or underlying leases and Tenant is advised in writing of the name and address of the mortgagee or landlord under such mortgage or ground or underlying lease, then this Lease shall not be terminated or cancelled on account of any default by the Landlord in the performance of any of the terms, covenants or conditions hereof on its part contained, until Tenant shall have given written notice of such default to such mortgagee or landlord, specifying the default, and such mortgagee or landlord shall have the right for thirty (30) days from the date of its receipt of such notice (and such reasonable additional time as is required to effect the cure) with due diligence, including time to get possession of the Premises by an expeditious trustee's sale or foreclosure action, if this should be necessary to effect such cure.

(b)   **Foreclosures.**   If any mortgage is foreclosed, then:

(i)   This Lease shall continue;

(ii)   Tenant's quiet possession shall not be disturbed if Tenant is not in Default;

(iii)   Tenant will attorn to and recognize the mortgagee or purchaser at foreclosure sale (Successor Landlord) as Tenant's landlord for the remaining Term; and

(iv)   The Successor Landlord shall not be bound by:

(1)   Any payment of Base Rent or Additional Rent for more than one month in advance, except the Security Deposit and free rent, if any, specified in the Lease,

(2)   Any amendment, modification, or ending of this Lease without Successor Landlord's consent after the Successor Landlord's name is given to Tenant unless the amendment, modification, or ending is specifically authorized by the original Lease and does not require Landlord's prior agreement or consent, and

(3)   Any liability for any act or omission of a prior Landlord.

(c)   **Self-Operating.**   This Section 14.01 is self-operating.  However, Tenant shall promptly execute and deliver reasonable documents needed to confirm this arrangement.

**14.02   Estoppel Certificate.**

(a)   **Obligation.**   Tenant shall, within ten (10) days after receiving a written request from Landlord, or if an offset statement is required for any sale, assignment or hypothecation of the Premises and/or the land thereunder by Landlord, execute and deliver to Landlord a written statement which may be relied upon by Landlord and any third party with whom the Landlord is dealing and which shall certify:

(i)   the accuracy of the Lease document;

22

_____ Please Initial
_____ Please Initial
_____ Please Initial

    (ii)   the Commencement and Expiration Dates of the Lease;

    (iii)   that the Lease is unmodified and in full effect or in full effect as modified, stating the date and nature of the modification;

    (iv)   whether to the Tenant's knowledge the Landlord is in default or whether the Tenant has any claims or demands against Landlord, and, if so, specifying the Default, claim, or demand; and/or

    (v)   to other correct and reasonably ascertainable facts that are covered by the Lease terms.

In the event an estoppel certificate or like document, in standard form, is prepared by Landlord or the mortgagee dealing with Landlord or its assigns, Tenant shall execute and deliver the same to Landlord within ten (10) days after receiving said document.

    (b)   **Remedy.** The Tenant's failure to comply with its obligations in Section 14.02(a) shall be a Default, except that the cure period for this Default shall be five (5) business days after the Tenant receives written notice of the Default.

**14.03   Quiet Possession.** If Tenant is not in Default, and subject to the Lease terms, Landlord warrants that Tenant's peaceable and quiet enjoyment of the Premises shall not be disturbed by anyone claiming by or through Landlord. Landlord shall not unreasonably interfere with the operations of Tenant's business as permitted under this Lease.

## ARTICLE XV
## LANDLORD'S RIGHTS

**15.01   Rules.**

    (a)   **Rules.** Tenant, its employees and invitees, shall comply with:

        (i)   the Rules attached as Exhibit D; and

        (ii)   reasonable modifications and additions to the Rules adopted by Landlord.

    (b)   **Conflict with Lease.** If a Rule issued under Section 15.01(a) conflicts with or is inconsistent with any Lease provision, the Lease provision controls.

    (c)   **Enforcement.** Although Landlord is not responsible for another tenant's failure to observe the Rules, Landlord shall not unreasonably enforce the Rules against Tenant.

**15.02   Mechanic's Liens.**

    (a)   **Indemnification.** Tenant agrees to indemnify and hold harmless Landlord from all claims for payment made by contractors, material suppliers, or any other person or firm engaged directly or indirectly by the Tenant in connection with alterations, improvements, or installations at the Premises.

    (b)   Tenant shall, within twenty (20) days after receiving notice of any mechanic's lien for material or work claimed to have been furnished to the Premises on Tenant's behalf and at Tenant's request:

        (i)   discharge the lien; or

        (ii)   post a bond equal to the amount of the disputed claim with companies reasonably satisfactory to Landlord.

If Tenant posts a bond, it shall contest the validity of the lien. Tenant shall indemnify, defend, and hold Landlord harmless from losses incurred from these liens.

    (c)   **Landlord's Discharge.** If Tenant does not discharge the lien or post the bond within the twenty (20) day period, Landlord may pay any amounts, including interest and legal fees, to discharge the lien. Tenant shall then be liable to Landlord for the amounts paid by Landlord as Additional Rent and shall pay the same to Landlord within ten (10) days after receiving Landlord's written statement setting forth the amount due and the basis for the charge to Tenant. Tenant's failure to pay the same within the ten-day period shall entitle Landlord to the same remedies it has upon Tenant's failure to pay Base Rent or Additional Rent.

    (d)   **Consent not implied. Tenant not an agent of Landlord.** This Section 15.02 is not a consent to subject Landlord's property to these liens. Tenant is not an agent, either expressly or impliedly, in any means or manner in the performance of any duty, obligation or activity permitted to be done by the Tenant at the Premises or elsewhere during the term of this Lease. If the event Tenant undertakes any alterations, improvements or repairs to the Premises, as permitted by this Lease, Tenant shall not represent to any party that the same are being made for Landlord or at Landlord' request, or that Tenant is doing so as an agent or representative of Landlord.

**15.03   Right to Enter.**

---

_____ Please Initial
_____ Please Initial
_____ Please Initial

(a) **Permitted Entries.** Landlord and its agents, servants, and employees may (but shall not have the duty to) enter the Premises at reasonable times, and at any time if an emergency, without charge, liability, or abatement of Base Rent and/or Additional Rent, to:

    (i) examine the Premises;

    (ii) make repairs, alterations, improvements, and additions either required by the Lease or advisable, in Landlord's sole discretion, to preserve the integrity, safety, and good order of part or all of the Premises or the Building;

    (iii) comply with Applicable Laws;

    (iv) show the Premises to prospective lenders or purchasers during the one hundred eighty (180) days prior to the expiration of this Lease;

    (v) post notices of non responsibility;

    (vi) remove any Alterations made by Tenant in violation of Article IV; and

    (vii) post "For Sale" or "For Lease" signs and, during the one hundred eighty (180) prior to the expiration of this Lease.

(b) **Entry Conditions.** Notwithstanding Section 15.03(a), entry is conditioned upon Landlord:

    (i) giving Tenant at least twelve (12) hours advance notice, except in an emergency;

    (ii) being accompanied by Tenant's representative, except in an emergency;

    (iii) promptly finishing any work for which it entered; and

    (iv) causing the least practical interference to Tenant's business.

**15.04 Holdover.**

(a) **Holdover Status.** If Tenant continues occupying the Premises after the Term ends ("Holdover") then:

    (i) if the Holdover is with Landlord's written consent, it shall be a month-to-month tenancy, terminable on thirty (30) days advance notice by either party. Tenant shall pay at the beginning of each month Base Rent that is five percent (5%) higher than the amount due in the last full month immediately preceding the Holdover period unless Landlord specifies a lower or higher Base Rent and Additional Rent in the written consent;

    (ii) if the Holdover is without Landlord's written consent, then Tenant shall be a tenant-at-sufferance. Tenant shall pay by the first day of each month two hundred percent (200%) the amount of Base Rent due in the last full month immediately preceding the Holdover period and shall be liable for any damages suffered by Landlord because of Tenant's Holdover, Landlord shall retain its remedies against Tenant who holds over without written consent.

(b) **Holdover Terms.** The Holdover shall be on the same terms and conditions of the Lease except:

    (i) the Term;

    (ii) Base Rent;

    (iii) the Options to Extend are deleted;

    (iv) the Quiet Possession provision is deleted;

    (v) Landlord's obligation for services and repairs is deleted; and

    (vi) consent to an assignment or sublease may be unreasonably withheld and delayed.

**15.05 Right to Sell or Transfer.** Landlord shall have the right to convey, transfer or assign, by sale or otherwise, all or any part of its interest in this Lease, the Premises or the Building at any time and from time to time and to any person, subject to the terms and conditions of this Lease. All covenants and obligations of Landlord under this Lease shall cease upon the execution of such conveyance, transfer or assignment, but such covenants and obligations shall run with the land and shall be binding upon the subsequent owner(s) thereof or of this Lease during the periods of their ownership thereof.

### ARTICLE XVI
### MISCELLANEOUS

---

24

_____ Please Initial
_____ Please Initial
_____ Please Initial

**16.01   Brokerage Fees.** The parties warrant no broker was involved in the procurement of this Lease. The party who breaches this warranty shall defend, hold harmless, and indemnify the nonbreaching party from any claims or liability arising from the breach. .

**16.02   Attorney's Fees.** In any litigation or other dispute resolution proceedings between the parties regarding this Lease, the nonprevailing party shall pay to the prevailing party all reasonable expenses and court costs including, but not limited to attorneys' fees, incurred by the prevailing party in connection with such proceedings (including, but not limited to, any appellate proceedings). A party shall be considered the prevailing party if:

(a)   it initiated the litigation and substantially obtains the relief it sought, either through a judgment or voluntary action before (after it is scheduled) trial or judgment;

(b)   the other party withdraws its action without substantially obtaining the relief it sought; or

(c)   it did not initiate the litigation and judgment is entered for either party, but without substantially granting the relief sought.

**16.03   Notices.** Unless a Lease provision expressly authorizes verbal notice, all notices under this Lease shall be in writing and sent by registered overnight courier or by registered or certified mail, postage prepaid, as follows:

| | |
|---|---|
| To Tenant: | **YancyJazz, LLP**<br>**319 Fayetteville Street Mall, Suite 105**<br>**Raleigh, NC  27601** |
| With a Copy to: | **John P. Marshall, Esq.**<br>**White & Allen, P.A.**<br>**106 S. McLewean Street**<br>**Kinston, NC  28501** |
| | and |
| To Landlord: | **Joyner Realty Company, Inc.**<br>**815 New Bern Avenue**<br>**Raleigh, NC  27601** |
| With a copy to: | **Ronald Dorrestein, Esq.**<br>**Dorrestein & Crane, P.C.**<br>**141 Providence Road, Suite 160**<br>**Chapel Hill, NC  27514** |

Either party may change these persons or addresses by giving notice as provided above. Tenant shall also give required notices to Landlord's mortgagee after receiving notice from Landlord of the mortgagee's name and address. Notice shall be considered given and received on the latest original delivery or attempted delivery date as indicated on the postage receipt(s) of all persons and addresses to which notice is to be given.

**16.04   Partial Invalidity.** If any Lease provision is invalid or unenforceable to any extent, then except that provision, the remainder of this Lease shall continue in effect and be enforceable to the fullest extent permitted by law.

**16.05   Waiver.** The failure of either party to exercise any of its rights is not a waiver of those rights. A party waives only those rights specified in writing and signed by the party waiving its rights.

**16.06   Waiver of Jury Trial and Counterclaim.** The parties hereto shall, and they hereby do, waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant, Tenant's use or occupancy of the leased Premises, and/or any claim for injury or damage. In the event Landlord commences any proceedings for non-payment of rent, minimum rent, or additional rent, Tenant will not interpose any counterclaim of whatever nature or description in any such proceedings. This shall not, however, be construed as a waiver of the Tenant's right to assert such claims in any separate action or actions brought by the Tenant.

**16.07   Indemnification.** Tenant indemnifies, defends, and holds Landlord, its officers, shareholders, directors, agents, successors and assigns, harmless from and against any and all claims, actions, damages, liability and expense, resulting due to or caused, in whole or in part, by any act or omission, negligence or willful misconduct of Tenant, its agents, contractors, employees, servants, lessees, concessionaires or invitees in violation or breach of this Lease. If, as a result of the foregoing, Landlord shall, without fault on its part, be made a party to any litigation commenced by or against Landlord and/or Tenant, then Tenant shall protect, indemnify, reimburse and hold Landlord harmless and shall pay any and all costs and expenses incurred by Landlord, including without limitation, court costs and reasonable attorney's fees in connection with such litigation, including the enforcement of any of its rights or remedies under this Lease. The provisions of this Section shall survive the expiration or termination of this Lease.

_____ Please Initial
_____ Please Initial
_____ Please Initial

**16.08    Binding on Successors.** This Lease shall bind the parties' heirs, estates, legatees, successors, representatives, and permitted assigns.

**16.09    Governing Law.** This Lease shall be governed by the laws of the state of North Carolina.

**16.10    Lease Not an Offer.** Landlord gave this Lease to Tenant for review.   It is not an offer to lease.  This Lease shall not be binding unless signed by both parties and an originally signed counterpart is delivered to Tenant.

**16.11    Recording.** Recording of this Lease is prohibited except as allowed in this paragraph.  At the request of either party, the parties shall promptly execute and record, at the cost of the requesting party, a short form memorandum describing the parties, the Premises and stating the term of this Lease, its Commencement and Expiration Dates, and other information the parties agree to include.

**16.12    Survival of Remedies.** The parties' remedies shall survive the expiration or termination of this Lease when caused by the Default of the other party.

**16.13    Authority of Parties.** Each party warrants that it is authorized to enter into the Lease, that the person signing on its behalf is duly authorized to execute the Lease, and that no other signatures are necessary.

**16.14 Accord and Satisfaction.** No payment by Tenant or receipt by Landlord of any amount less than is due hereunder shall be deemed to be other than payment towards or on account of the earliest portion of the amount then due, nor shall any endorsement or statement on any check or payment (or in any letter accompanying any check or payment) be deemed an "accord and satisfaction" (or payment in full), and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such amount or pursue any other remedy provided herein.

**16.15    Business Days.** Business day means Monday through Friday inclusive, excluding holidays identified at Section 7.02(b). Throughout this Lease, wherever "days" are used the term shall refer to calendar days.  Wherever the term "business days" is used the term shall refer to business days.

**16.16    Entire Agreement.** This Lease contains the entire and complete agreement between the parties hereto and supersedes any prior oral or written agreements between the parties with respect to the lease for the Premises.  It is expressly agreed that there are no verbal understandings or agreements which in any way change the terms, covenants and conditions herein set forth, and that no modification of this Contract and no waiver of any of its terms or conditions shall be effective unless made in writing and duly executed by the parties hereto.  Except for the Rules for which Section 15.01(a) controls, this Lease shall be modified only by a writing signed by both parties.

**16.17    Headings.** Headings of paragraphs, articles or sections are for convenience only and shall not be considered in construing the meanings of the contents of such paragraphs, articles or sections.

**16.18    Time.** Time is of the essence to this Lease and to each and all of its provisions.

**16.19    No Rule of Construction.** The parties acknowledge that this Agreement was initially prepared by the Landlord solely as a convenience and that all parties and their counsel have read and fully negotiated all the language used in this Agreement.  The parties acknowledge and agree that because all parties and their counsel participated in negotiating and drafting this Agreement, no rule of construction shall apply to this Agreement which construes any language, whether ambiguous, unclear or otherwise, in favor of, or against any party by reason of that party's role in drafting this Agreement.

**16.20    Principals of Tenant.** The principals of tenant are Mark L. Valentine and Harvey Yancey.  As a material condition of Landlord's willingness to enter into this Lease, in the event that Harvey Yancy is (a) no longer a Twenty Five (25%) percent or greater partner/owner/shareholder/member as the case may be or (b) no longer meaningfully involved in the day to day operations of Tenant, then Landlord shall have the option to terminate this Lease upon thirty (30) days notice to Tenant.  Additional principals of Tenant may be included throughout the term of this Lease with written approval from Landlord, which approval shall not be unreasonably withheld.

**16.21    OFAC.** Tenant represents and warrants to Landlord that neither Tenant nor any affiliate or representative of Tenant, nor any person/entity directly or indirectly holding any legal or beneficial interest whatsoever in Tenant (collectively "Tenant Parties") is, or at anytime during the term of this Lease shall be: (i) a person/entity with whom a United States person/entity or financial institution established under the laws of the United States is prohibited from transacting business of the type contemplated by this Lease, whether such prohibition arises under U.S. law, regulation, executive order (including without limitation, executive orders and lists published by the United States Office of Foreign Asset Control with respect to executive orders and lists published by the United States Office of Foreign Asset Control with respect to "Specially Designated Nationals and Blocked Persons") or otherwise, (ii) included in, owned by, controlled by, acting for or on behalf of, providing assistance, support, sponsorship, or services of any king to, or otherwise associated with any of the persons or entities referred to are described in Executive Order 13224 – Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism, as amended, (iii) in violation of any provisions of the USA Patriot Act, Pub. L. No. 107-56.  For purposes of this paragraph, "Person" means any individual, partnership, corporation, limited liability company, trust or other entity, and "United States Person" means a person that is a citizen or resident of the United States, a corporation, partnership, limited liability company, or other entity created or organized in or under the laws of the United States or any political subdivision thereof, or an estate or trust the income of which is subject to United States federal income taxation regardless of its source.  Notwithstanding, if Tenant is a publicly traded entity, this paragraph shall not apply to Tenant Parties to the extent that such Person's interest in the Tenant is through a U.S. Publicly-Traded or Pension Entity.  "U.S. Publicly-Traded or Pension Entity" means either (A) a Person (other than an individual) whose securities are listed on a national securities exchange, or

---

26

_____ Please Initial
_____ Please Initial
_____ Please Initial

quoted on an automated quotation system, in the United States, or a wholly-owned subsidiary of such a Person, or (B) an "employee pension benefit plan" or "pension plan" as defined in Section 3(2) of ERISA. Tenant covenants and agrees to deliver to Landlord any certification or other evidence requested from time to time by Landlord, in its sole discretion, confirming Tenant's compliance with the provisions of this Section. In addition, Tenant hereby authorized Landlord and any of its affiliates to submit and/or release any and all information it may deem appropriate to determine whether Tenant complies with this paragraph throughout the Term. In the event any of the representations in this paragraph are determined to be false now or at any time during the Term, Tenant shall be deemed to have committed an incurable default, entitling Landlord, in addition to all other remedies at law or in equity, to terminate this Lease on five (5) days written notice to Tenant.

**16.22** **Definition of Lease.** This Lease consists of the following:

    (a)   Title Page;

    (b)   Table of Contents;

    (c)   Articles I through XVI;

    (d)   Signature Page;

    (e)   Rider A – Options to Extend

    (f)   Rider B – Personal Guaranty

    (g)   Exhibits A through E.

[SIGNATURE PAGE FOLLOWS]

_____ Please Initial
_____ Please Initial
_____ Please Initial

*IN WITNESS WHEREOF*, the parties hereto have duly executed this Lease the day and year first above written.

*LANDLORD:*                         THE BARNEY G. JOYNER FAMILY TRUST                    (seal)

By: _____

David Lee Joyner

Its:  Trustee

By: _____ (seal)

Joyner Realty Company, Inc.

Its:  Agent

*TENANT:*                           YANCY JAZZ, LLP                    (seal)

By: _____

Mark L. Valentine

Its:  General Partner

ACKNOWLEDGMENTS
to follow on next page

---

_____ Please Initial
_____ Please Initial
_____ Please Initial

NORTH CAROLINA
WAKE COUNTY

I, *Chyanne W Rock*, a Notary Public for _WAKE_ County, North Carolina, do hereby certify that David Lee Joyner, Trustee and attorney-in-fact for Phyllis M. Joyner , Carolyn J. Driggers (formerly Carolyn J. Groover) and Phyllis J. Chapell, Trustees of the Barney G. Joyner Family Trust, personally appeared before me this day and, being first duly sworn, acknowledged that by authority contained in an instrument duly executed, acknowledged, and recorded on Book 4552, Page 699, Wake County Register of Deeds, North Carolina, that he executed the foregoing instrument under and by virtue of the authority given by said instrument granting him power of attorney, for the purposes expressed in the foregoing instrument.

Witness my hand and official seal, this the _30_ day of _April_, 2007.

_____
Notary Public [Signature]

*CHYANNE W. Rock*
[Typed or Printed Name of Notary Public]

My Commission Expires: _10-8-2011_


NORTH CAROLINA
WAKE COUNTY

I, *Chyanne W Rock*, a Notary Public for _WAKE_ County, North Carolina, do hereby certify that David Lee Joyner personally appeared before me this day and, being first duly sworn, acknowledged that he is the President of Joyner Realty Company, Inc., a North Carolina corporation, and that by authority duly given and as the act of the corporation, the foregoing instrument was signed in its name by its President.

Witness my hand and official seal, this the _30_ day of _April_ 2007.

_____
Notary Public [Signature]

*CHYANNE W Rock*
[Typed or Printed Name of Notary Public]

My Commission Expires: _10-8-2011_


NORTH CAROLINA
WAKE COUNTY

I, *CHYANNE W Rock*, a Notary Public for _WAKE_ County, North Carolina, do hereby certify that Mark L. Valentine personally appeared before me this day and, being first duly sworn, acknowledged that he is the General Partner of YancyJazz, LLP., a North Carolina limited liability partnership, and that by authority duly given and as the act of the limited liability partnership, the foregoing instrument was signed in its name by its General Partner.

Witness my hand and official seal, this the _30_ day of _April_, 2007.

_____
Notary Public [Signature]

*CHYANNE W Rock*
[Typed or Printed Name of Notary Public]

My Commission Expires: _10-8-2011_

_____ Please Initial
_____ Please Initial
_____ Please Initial

### *RIDER A*
Options to Extend

**THIS RIDER** constitutes a part of the Lease to which it is attached.  In the event of a conflict between this Rider and the provisions of the Lease, the Rider will govern and control.

1.  **Options to Extend.**

   (a)  **Options.**  Tenant may extend this Lease for a period of two (2) five-year terms (each called an "Extension Term") beginning immediately after the Term, upon the same terms and conditions of the Lease,  as follows:

| Years | | Annual Base Rents | Monthly Base Rents |
|-------|--|-------------------|--------------------|
| Year 11 | (5/1/2017 – 4/30/2018) | $337,440.00 | $28,120.00 |
| Year 12 | (5/1/2018 -- 4/30/2019) | $344,184.00 | $28,682.00 |
| Year 13 | (5/1/2019 -- 4/30/2020) | $351,072.00 | $29,256.00 |
| Year 14 | (5/1/2020 -- 4/30/2021) | $358,092.00 | $29,841.00 |
| Year 15 | (5/1/2021 -- 4/30/2022) | $365,256.00 | $30,438.00 |
| Year 16 | (5/1/2022 -- 4/30/2023) | $372,564.00 | $31,047.00 |
| Year 17 | (5/1/2023 -- 4/30/2024) | $380,016.00 | $31,668.00 |
| Year 18 | (5/1/2024 -- 4/30/2025) | $387,612.00 | $32,301.00 |
| Year 19 | (5/1/2025 -- 4/30/2026) | $395,364.00 | $32,947.00 |
| Year 20 | (5/1/2026 -- 4/30/2027) | $403,272.00 | $33,606.00 |

   (i)  the Term shall be modified as stated above;

   (iii)  after the first Extension Term, the Option to Extend shall be deleted..

   (b)  **Conditions.**  To exercise these Options to Extend Tenant must:

   (1)  not be in default at the time it exercises the Option to Extend; and

   (2)  give notice to Landlord that Tenant is exercising its Option to Extend at least four (4) calendar months before the previous Term or Extension Term (as applicable) ends.

   (c)  **Failure to Provide Notice**.  In the event Landlord does not receive Tenant's notice within the time frame described above, these Options to Renew shall become null and void and the Lease shall terminate on the Expiration Date.

_____ Please Initial
_____ Please Initial
_____ Please Initial

*RIDER B(1)*
*Personal Guaranty of Lease Obligations*

**THIS RIDER** constitutes a part of the Lease to which it is attached.  In the event of a conflict between this Rider and the provisions of the Lease, the Rider will govern and control.

This Guaranty of Lease Obligations is given as of the date indicated below by Mark A. Valentine ("Guarantor") to and in favor of Joyner Realty Company, Inc., Agent for The Barney G. Joyner Family Trust ("Landlord") on behalf and for the account of YancyJazz LLP, a North Carolina limited liability partnership ("Tenant").

RECITALS:

1.      Landlord and Tenant intend to be parties to that certain lease dated February 1, 2006 (the "Lease"), pursuant to which Landlord has agreed to lease to Tenant certain real property and related improvements located in Raleigh, Wake County, North Carolina, as more particularly described in the Lease (the "Premises").

2.      Landlord is unwilling to lease the Premises to Tenant unless Guarantor executes and delivers this Guaranty.

3.      Landlord's leasing of the Premises to Tenant will, directly or indirectly, materially benefit Guarantor, and therefore, Guarantor has agreed to execute and deliver this Guaranty.

4.      Guarantor has received a copy of the Lease, has examined the Lease, and is familiar with all the terms, covenants and conditions contained therein.

NOW THEREFORE, for valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor agrees as follows:

1.      The foregoing recitals are true and correct and incorporated herein.

2.      Guarantor hereby guarantees all of the payments to be made by Tenant under the Lease.  All such payments are herein and in the Lease called "Rent", and include Base Rent and Additional Rent (as such expressions are defined in the Lease) and all other sums, costs, expenses, charges, payments, indemnifications by Tenant to Landlord, and deposits, as well as all sums payable as damages upon a default under the Lease.  Guarantor hereby guarantees that each and all of the foregoing will be paid in full when due in accordance with the Lease.  Furthermore, Guarantor hereby guarantees that, in addition to paying all sums described herein and in the Lease, Tenant will faithfully perform and observe each and every term, covenant, and condition of the Lease to be performed or observed by Tenant.

2.      This Guaranty is an unconditional, irrevocable and absolute guaranty of payment and performance.  Guarantor's liability shall be primary and not derivative or secondary.  If for any reason any provision of the Lease shall not be completely and strictly performed or observed by Tenant as required thereby, or if any item of Rent shall not be paid when due in accordance with the provisions of the Lease, Guarantor agrees to promptly perform or observe, or cause the performance or observance of each such provision, and will immediately pay all such items or Rent to the person entitled thereto pursuant to the provisions of the Lease, in all cases regardless of whether Landlord shall have taken any steps to enforce any rights against Tenant or any other person to compel any such performance or observance or to collect the item(s) of Rent either pursuant to the provisions of the Lease, or at law, or in equity, and regardless of any other condition or contingency.  Guarantor also agrees to pay to Landlord the costs and expenses (including reasonable attorneys' fees) incurred by Landlord for collecting or attempting to collect any item(s) of Rent or otherwise enforcing the Lease against Tenant or collecting under or enforcing this Guaranty.  Landlord shall have the right to enforce this Guaranty regardless of the receipt by Landlord of a security deposit from Tenant or the enforcement of any remedies against such security or the release of such security.

3.      Guarantor's obligations under this Guaranty shall in no way be affected or impaired by reason of the happening at any time of any of the following with respect to either the Lease or the Guaranty, even if such happening occurs without notice to or consent of Guarantor:  (a) the waiver by Landlord or its successors or assigns of the performance by Tenant of any provision(s) of the Lease; (b) the extension of the time for payment by Tenant of any item(s) of Rent or of the time for performance by Tenant of any other obligations under the Lease; (c) the assignment, subletting, or mortgaging, or the purported assignment, subletting, or mortgaging, of all or part of Tenant's interest in the Lease or the Leased Premises whether or not permitted by the Lease, or permitted by Landlord; (d) the modification or amendment (whether material or otherwise) of any obligation of Tenant set forth in the Lease; (e)

---

31

Landlord's taking or failing to take any action(s) referred to in the Lease; (f) the failure, omission, or delay of Landlord to enforce, assert, or exercise any right, power, or remedy conferred on Landlord in the Lease or by law or any action on the part of Landlord granting indulgence or extension in any form; (g) the voluntary or involuntary bankruptcy of Tenant or the liquidation, dissolution, sale, or other disposition of all or substantially all the assets, marshalling of assets and liabilities, receivership, insolvency, assignment for the benefit of creditors, reorganization, arrangement, composition or readjustment of, or the disaffirmance of the Lease in any such proceeding; (h) the release of Tenant from performance of any provision of the Lease by operation of law; (i) the receipt and acceptance by Landlord of notes, checks, or other instruments for the payment of money made by Tenant or others, or any extensions or renewals thereof; or (j) any other cause, whether similar to or dissimilar from any of the foregoing. Furthermore, in the event of rejection or disaffirmance of the Lease by Tenant or Tenant's trustee in bankruptcy pursuant to the United State Bankruptcy Code or any other law affecting creditors' rights, Guarantor will, if Landlord so requests, assume all obligations and liabilities of Tenant under the Lease, to the same extent as if Guarantor had been originally named instead of Tenant as a party to the Lease and there had been no rejection or disaffirmance; and Guarantor will confirm such assumption in writing at the request of Landlord on or after such rejection or disaffirmance. Guarantor, upon such assumption, shall have all rights of Tenant under the Lease (to the extent permitted by law).

4.      Guarantor hereby waives notice of:  a) the acceptance of this Guaranty; b) notice of any breach or non-performance of the Lease by Tenant, or the failure to satisfy any obligations or liabilities contracted or incurred by Tenant; and, c) notice of execution and delivery of the Lease.  Additionally, Guarantor waives all suretyship defenses and consents to the Supreme Court of North Carolina or any other appropriate Court of that State having jurisdiction in which to bring any claim by Landlord.

5.      This Guaranty may be enforced and shall be governed by and construed in accordance with the laws of the State of North Carolina.

6.      This Guaranty may not and cannot be cancelled, terminated, modified, or amended except by a written agreement executed by Landlord and delivered to Guarantor.  Any attempted cancellation, termination, modification, or amendment without such agreement executed and delivered by Landlord shall be void.

7.      No waiver by Landlord of the payment by Guarantor of any of its obligations contained in this Guaranty, or any extension of time for the payment by Guarantor of any such obligations, shall affect or impair this Guaranty or constitute a waiver or relinquishment of any rights of Landlord for the future.  No action brought under this Guaranty against Guarantor and no recovery had in pursuance thereof shall be any bar or defense to any further action or recovery which may be brought or had under this Guaranty by reason of any further default(s) of Tenant.

8.      All the provisions of this Guaranty shall inure to the benefit of Landlord and its grantees, successors, and assigns, and shall inure to the benefit of any future owner of the fee title of which the Leased Premises are a part and shall inure to the benefit of any lessee to whom the property shall have been leased contemporaneously with a transfer of fee title (a so-called "sale and leaseback transaction"); and all the provisions of this Guaranty shall be binding upon Guarantor and its heirs, legal representatives, successors and assigns.

9.      This Guaranty shall be in effect with respect to any and all renewals, extensions, or continuations of the Lease whether or not the Lease provides for or permits such renewals, extensions, or continuations, and whenever such renewals, extensions, or continuations shall commence, and whether such renewals, extensions, or continuations shall be pursuant to a renewal, extension, or continuation agreement incorporating all or part(s) of the Lease by reference or shall be pursuant to a new and separate lease agreement.  The provisions of this Guaranty shall also apply with respect to such period(s) of time that Tenant holds over, until the Leased Premises has been surrendered in accordance with the provisions of the Lease.

10.     As a further inducement to Landlord to make and enter into the Lease and in consideration thereof, Guarantor hereby covenants and agrees that in any action or proceeding brought by Landlord on, under or by virtue of this Guaranty or arising out of the terms, covenants and provisions of this Guaranty or of the Lease, Guarantor shall and hereby does waive trial by jury.

11.     Guarantor may be joined in any action against Tenant in connection with the Lease and recovery may be had against Guarantor in such action or in any independent action against Guarantor.

12.     If this Guaranty is signed by more than one person or entity as Guarantor, then the persons and/or entities are jointly and severally referred to herein as Guarantor and each such person or entity shall be jointly and severally liable for all of the obligations of Guarantor.

13.     All of Landlord's rights and remedies under the Lease and under this Guaranty shall be distinct, separate and cumulative and no such right or remedy shall be exclusive of, or a waiver of, any of the others.

_____ Please Initial
_____ Please Initial
_____ Please Initial

14.     Any notice required or permitted to be given under this Guaranty shall be in writing and sent to by United States Registered or Certified Mail, Return Receipt Requested, or by registered overnight courier (e.g. Federal Express), to the address below or to such other address as such party shall have designated by similar written notice; and such notice shall be deemed to have been given as of the day it was sent as indicated by the postmark on the envelope containing the notice or comparable evidence:

| | |
|---|---|
| Landlord: | Joyner Realty Company, Inc.<br>815 New Bern Avenue<br>Raleigh, NC  27601 |
| With a copy to: | Ronald Dorrestein, Esquire<br>Dorrestein & Crane, P.C.<br>141 Providence Road, Suite 160<br>Chapel Hill, NC  27514 |
| Guarantor: | Mark L. Valentine<br>The Hudson, Suite 513<br>319 Fayetteville Street Mall<br>Raleigh, NC  27601 |

All payments made under the Guaranty shall be sent to Landlord at the above address or at such other address as Landlord shall provide by written notice from time to time.

15.     This Guaranty, the obligations and liabilities of the Guarantor hereunder, and any payment by Guarantor pursuant hereto, shall be without recourse by the Guarantor against the Tenant whose obligations or liabilities are guarantied by this Guaranty.

16.     This Guaranty shall inure to the benefit of Landlord and its successors and assigns and shall bind Guarantor, its successors and assigns.

IN WITNESS WHEREOF, Guarantor has caused this Guaranty to be duly executed as of the date indicated below.

GUARANTOR:

_____
Mark L. Valentine
Social Security Number: _237 02 0559_

NORTH CAROLINA
_WAKE_ COUNTY

I, the undersigned, a Notary Public of _WAKE_ County, North Carolina, certify that Mark L. Valentine personally appeared before me this day and acknowledged the execution of the foregoing instrument.

Witness my hand and official seal or stamp, this _30_ day of _April_ , 2007.

_____
Notary Public [Signature]

_CHYANNE W. Rock_
Notary Public [Printed or Typed Name]

My Commission Expires: _10-8-2011_

_____ Please Initial
_____ Please Initial
_____ Please Initial

**RIDER B(2)**
*Personal Guaranty of Lease Obligations*

**THIS RIDER** constitutes a part of the Lease to which it is attached.  In the event of a conflict between this Rider and the provisions of the Lease, the Rider will govern and control.

This Guaranty of Lease Obligations is given as of the date indicated below by Harvey Yancey ("Guarantor") to and in favor of Joyner Realty Company, Inc., Agent for The Barney G. Joyner Family Trust ("Landlord") on behalf and for the account of YancyJazz LLP, a North Carolina limited liability partnership ("Tenant").

RECITALS:

1.      Landlord and Tenant intend to be parties to that certain lease dated April 1, 2007 (the "Lease"), pursuant to which Landlord has agreed to lease to Tenant certain real property and related improvements located in Raleigh, Wake County, North Carolina, as more particularly described in the Lease (the "Premises").

2.      Landlord is unwilling to lease the Premises to Tenant unless Guarantor executes and delivers this Guaranty.

3.      Landlord's leasing of the Premises to Tenant will, directly or indirectly, materially benefit Guarantor, and therefore, Guarantor has agreed to execute and deliver this Guaranty.

4.      Guarantor has received a copy of the Lease, has examined the Lease, and is familiar with all the terms, covenants and conditions contained therein.

NOW THEREFORE, for valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor agrees as follows:

1.      The foregoing recitals are true and correct and incorporated herein.

2.      Guarantor hereby guarantees Twenty Five (25%) percent of all of the payments to be made by Tenant under the Lease.  All such payments are herein and in the Lease called "Rent", and include Base Rent and Additional Rent (as such expressions are defined in the Lease) and all other sums, costs, expenses, charges, payments, indemnifications by Tenant to Landlord, and deposits, as well as all sums payable as damages upon a default under the Lease.  Guarantor hereby guarantees that each and all of the foregoing will be paid in full when due in accordance with the Lease.  Furthermore, Guarantor hereby guarantees that, in addition to paying all sums described herein and in the Lease, Tenant will faithfully perform and observe each and every term, covenant, and condition of the Lease to be performed or observed by Tenant.

2.      This Guaranty is an unconditional, irrevocable and absolute guaranty of payment and performance.  Guarantor's liability shall be primary and not derivative or secondary.  If for any reason any provision of the Lease shall not be completely and strictly performed or observed by Tenant as required thereby, or if any item of Rent shall not be paid when due in accordance with the provisions of the Lease, Guarantor agrees to promptly perform or observe, or cause the performance or observance of each such provision, and will immediately pay all such items or Rent to the person entitled thereto pursuant to the provisions of the Lease, in all cases regardless of whether Landlord shall have taken any steps to enforce any rights against Tenant or any other person to compel any such performance or observance or to collect the item(s) of Rent either pursuant to the provisions of the Lease, or at law, or in equity, and regardless of any other condition or contingency.  Guarantor also agrees to pay to Landlord the costs and expenses (including reasonable attorneys' fees) incurred by Landlord for collecting or attempting to collect any item(s) of Rent or otherwise enforcing the Lease against Tenant or collecting under or enforcing this Guaranty.  Landlord shall have the right to enforce this Guaranty regardless of the receipt by Landlord of a security deposit from Tenant or the enforcement of any remedies against such security or the release of such security.

3.      Guarantor's obligations under this Guaranty shall in no way be affected or impaired by reason of the happening at any time of any of the following with respect to either the Lease or the Guaranty, even if such happening occurs without notice to or consent of Guarantor:  (a) the waiver by Landlord or its successors or assigns of the performance by Tenant of any provision(s) of the Lease; (b) the extension of the time for payment by Tenant of any item(s) of Rent or of the time for performance by Tenant of any other obligations under the Lease; (c) the assignment, subletting, or mortgaging, or the purported assignment, subletting, or mortgaging, of all or part of Tenant's interest in the Lease or the Leased Premises whether or not permitted by the Lease, or permitted by Landlord; (d) the modification or amendment (whether material or otherwise) of any obligation of Tenant set forth in the Lease; (e)

_____ Please Initial
_____ Please Initial
_____ Please Initial

Landlord's taking or failing to take any action(s) referred to in the Lease; (f) the failure, omission, or delay of Landlord to enforce, assert, or exercise any right, power, or remedy conferred on Landlord in the Lease or by law or any action on the part of Landlord granting indulgence or extension in any form; (g) the voluntary or involuntary bankruptcy of Tenant or the liquidation, dissolution, sale, or other disposition of all or substantially all the assets, marshalling of assets and liabilities, receivership, insolvency, assignment for the benefit of creditors, reorganization, arrangement, composition or readjustment of, or the disaffirmance of the Lease in any such proceeding; (h) the release of Tenant from performance of any provision of the Lease by operation of law; (i) the receipt and acceptance by Landlord of notes, checks, or other instruments for the payment of money made by Tenant or others, or any extensions or renewals thereof; or (j) any other cause, whether similar to or dissimilar from any of the foregoing. Furthermore, in the event of rejection or disaffirmance of the Lease by Tenant or Tenant's trustee in bankruptcy pursuant to the United State Bankruptcy Code or any other law affecting creditors' rights, Guarantor will, if Landlord so requests, assume all obligations and liabilities of Tenant under the Lease, to the same extent as if Guarantor had been originally named instead of Tenant as a party to the Lease and there had been no rejection or disaffirmance; and Guarantor will confirm such assumption in writing at the request of Landlord on or after such rejection or disaffirmance. Guarantor, upon such assumption, shall have all rights of Tenant under the Lease (to the extent permitted by law).

4.    Guarantor hereby waives notice of: a) the acceptance of this Guaranty; b) notice of any breach or non-performance of the Lease by Tenant, or the failure to satisfy any obligations or liabilities contracted or incurred by Tenant; and, c) notice of execution and delivery of the Lease. Additionally, Guarantor waives all suretyship defenses and consents to the Supreme Court of North Carolina or any other appropriate Court of that State having jurisdiction in which to bring any claim by Landlord.

5.    This Guaranty may be enforced and shall be governed by and construed in accordance with the laws of the State of North Carolina.

6.    This Guaranty may not and cannot be cancelled, terminated, modified, or amended except by a written agreement executed by Landlord and delivered to Guarantor. Any attempted cancellation, termination, modification, or amendment without such agreement executed and delivered by Landlord shall be void.

7.    No waiver by Landlord of the payment by Guarantor of any of its obligations contained in this Guaranty, or any extension of time for the payment by Guarantor of any such obligations, shall affect or impair this Guaranty or constitute a waiver or relinquishment of any rights of Landlord for the future. No action brought under this Guaranty against Guarantor and no recovery had in pursuance thereof shall be any bar or defense to any further action or recovery which may be brought or had under this Guaranty by reason of any further default(s) of Tenant.

8.    All the provisions of this Guaranty shall inure to the benefit of Landlord and its grantees, successors, and assigns, and shall inure to the benefit of any future owner of the fee title of which the Leased Premises are a part and shall inure to the benefit of any lessee to whom the property shall have been leased contemporaneously with a transfer of fee title (a so-called "sale and leaseback transaction"); and all the provisions of this Guaranty shall be binding upon Guarantor and its heirs, legal representatives, successors and assigns.

9.    This Guaranty shall be in effect with respect to any and all renewals, extensions, or continuations of the Lease whether or not the Lease provides for or permits such renewals, extensions, or continuations, and whenever such renewals, extensions, or continuations shall commence, and whether such renewals, extensions, or continuations shall be pursuant to a renewal, extension, or continuation agreement incorporating all or part(s) of the Lease by reference or shall be pursuant to a new and separate lease agreement. The provisions of this Guaranty shall also apply with respect to such period(s) of time that Tenant holds over, until the Leased Premises has been surrendered in accordance with the provisions of the Lease.

10.    As a further inducement to Landlord to make and enter into the Lease and in consideration thereof, Guarantor hereby covenants and agrees that in any action or proceeding brought by Landlord on, under or by virtue of this Guaranty or arising out of the terms, covenants and provisions of this Guaranty or of the Lease, Guarantor shall and hereby does waive trial by jury.

11.    Guarantor may be joined in any action against Tenant in connection with the Lease and recovery may be had against Guarantor in such action or in any independent action against Guarantor.

12.    If this Guaranty is signed by more than one person or entity as Guarantor, then the persons and/or entities are jointly and severally referred to herein as Guarantor and each such person or entity shall be jointly and severally liable for all of the obligations of Guarantor.

13.    All of Landlord's rights and remedies under the Lease and under this Guaranty shall be distinct, separate and cumulative and no such right or remedy shall be exclusive of, or a waiver of, any of the others.

---

_____ Please Initial
_____ Please Initial
_____ Please Initial

14.     Any notice required or permitted to be given under this Guaranty shall be in writing and sent to by United States Registered or Certified Mail, Return Receipt Requested, or by registered overnight courier (e.g. Federal Express), to the address below or to such other address as such party shall have designated by similar written notice; and such notice shall be deemed to have been given as of the day it was sent as indicated by the postmark on the envelope containing the notice or comparable evidence:

| | |
|---|---|
| Landlord: | Joyner Realty Company, Inc.<br>815 New Bern Avenue<br>Raleigh, NC 27601 |
| With a copy to: | Ronald Dorrestein, Esquire<br>Dorrestein & Crane, P.C.<br>141 Providence Road, Suite 160<br>Chapel Hill, NC 27514 |
| Guarantor: | Harvey Yancey<br>The Hudson, Suite 204<br>319 Fayetteville Street Mall<br>Raleigh, NC 27601 |

All payments made under the Guaranty shall be sent to Landlord at the above address or at such other address as Landlord shall provide by written notice from time to time.

15.     This Guaranty, the obligations and liabilities of the Guarantor hereunder, and any payment by Guarantor pursuant hereto, shall be without recourse by the Guarantor against the Tenant whose obligations or liabilities are guarantied by this Guaranty.

16.     This Guaranty shall inure to the benefit of Landlord and its successors and assigns and shall bind Guarantor, its successors and assigns.

        IN WITNESS WHEREOF, Guarantor has caused this Guaranty to be duly executed as of the date indicated below.


GUARANTOR:

*Harvey Yancey* (signature)

Harvey Yancey

Social Security Number: _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_


NORTH CAROLINA

_WAKE_ COUNTY

        I, the undersigned, a Notary Public of _WAKE_ County, North Carolina, certify that Harvey Yancy personally appeared before me this day and acknowledged the execution of the foregoing instrument.

        Witness my hand and official seal or stamp, this _30_ day of _April_, 2007.

(Notary seal: CHYANNE W. ROCK NOTARY Comm. Exp. 10-8-2011 PUBLIC WAKE COUNTY NC)

_Chyanne W Rock_
Notary Public *[Signature]*

_Chyanne W. Rock_
Notary Public *[Printed or Typed Name]*

My Commission Expires: _10-8-2011_

36

*EXHIBIT A*
PREMISES

_____ Please Initial
_____ Please Initial
_____ Please Initial



*EXHIBIT B*
BUILDING

_____ Please Initial
_____ Please Initial
_____ Please Initial

(Page 1 of 1)

BKCM2005PG394A8





*EXHIBIT C*
LAND

_____ Please Initial
_____ Please Initial
_____ Please Initial

Lying and being in the City of Raleigh, Wake County, North Carolina, and being more specifically described as:

BEGINNING at a point in the eastern technical right of way of South Fayetteville Street (a 99' public right of way), said point having NCGS Grid Monument (Harsal) coordinates of N (Y) = 738,367.4734 and E (X) = 2,106.697,5320; running thence South 26° 33' 36" East 759.03 feet (ground distance) or 758.97 feet (grid distance) to the TRUE POINT AND PLACE OF BEGINNING; running thence South 87° 29' 41" East 210.00 feet to an existing iron pipe in the western technical right of way of South Wilmington Street (a 66' public right of way); running thence along with western technical right of way of South Wilmington Street South 02° 13' 57" West 189.06 feet to a point in the western technical right of way of South Wilmington Street, said point being a common corner with 333 Corporate Plaza, LLC: running thence along the common property line with 333 Corporate Plaza, LLC, North 87° 53' 45" West 210.00 feet to a point in the eastern technical right of way of South Fayetteville Street; running thence along the eastern technical right of way of South Fayetteville Street North 02° 13' 57" East 190.53 feet to the TRUE POINT AND PLACE OF BEGINNING. Being all of Lot 5 as shown on that certain survey entitled "Old Hudson Belk Property Currently Owned by the City of Raleigh", prepared by the Derward W. Baker & Associates, dated March 5, 2001, and last revised November 27, 2001, and being a portion of that property as shown on plat recorded in Book of Maps 1959, Pages 275 and 276, Wake County Registry;

TOGETHER WITH AND INCLUDING the appurtenant easement, privilege and right of continued encroachment, occupancy and use by the owner and its agents, tenants, guests, invitees, successors and assigns of the property and the area upon which certain elements of the improvements currently located thereon presently encroach (and upon which elements of the improvements to be constructed thereof shall encroach when such improvements are constructed and/or reconstructed in accordance with the redevelopment of the property pursuant to the agreement between the City of Raleigh and the Grantor for the purchase and development of same), said easement to continue for so long as the improvements continue to exist and encroach upon said area, including upon the construction, maintenance, repair, reconstruction, and rebuilding of same after any casualty to such improvements, which easement shall run with the land described above and are more specifically described as follows:

(1)   Easement for three (3) canopies projecting a maximum of nine (9) feet along the western length of the above-described property above Fayetteville Street right of way at a height of thirteen (13) to seventeen (17) feet above the sidewalk, with canopy suspension cables projecting a maximum of nine (9) feet along the western length of the above-described property above Fayetteville Street right of way at a height of thirteen (13) to twenty-five (25) feet above the sidewalk; and

(2)   Easement for decorative cornices projecting a maximum of two and one-half (2.5) feet along the western length of the above-described property above the Fayetteville Street right of way at a height of twenty (20) to seventy-nine (79) feet above the sidewalk; and

(3)   Easement for the building faced and structural elements to encroach a maximum of one and twelve one-hundredths (1.12) feet along the western length of the above-described property across, into and above the Fayetteville Street right of way from the sidewalk to the roof of the improvements to be constructed; and

(4)   Easement for three (3) street trees to encroach into, under and across the South Wilmington Street right of way at a distance of two (2) feet from the back of the curb of South Wilmington Street, which easement shall include the right to place, maintain and replace tree grates, brick paving and entrances; and

(5)   Easement for a canopy projecting a maximum of five (5) feet along the eastern length of the above-described property above South Wilmington Street right of way at a height of nine (9) to twenty-five (25) feet above the sidewalk; and

(6)   Easement for the building façade and structural elements to encroach a maximum of eight tenths (.80) feet along the eastern length of the above-described property, across, into and above the South Wilmington Street right of way from the sidewalk to the roof of the improvements to be constructed; and

(7)   Easement for a building stairwell projecting a maximum of one and two tenths (1.20) feet along the eastern length of the above-described property across, into and above the South Wilmington Street right of way from the sidewalk to the roof of the improvements to be constructed;

the foregoing easements including surface and air rights for the location, use, maintenance, repair, and reconstruction of the improvements described herein, subject, however, to all applicable ordinances of the City of Raleigh pertaining to encroachments upon the public rights-of-way and which easement areas are also shown on that certain illustrative plat attached as Exhibit B to that certain Deed recorded in Book 9977, Page 1079, Wake County Registry.

*EXHIBIT D*
RULES AND REGULATIONS

(1) **Access to Common Areas of the Property**. Landlord may from time to time establish security controls for the purpose of regulating access to the common areas of the Building. Tenant shall abide by all such security regulations so established and agrees to always leave clear access for vehicular and pedestrian traffic through all parking lots, loading/delivery areas, ramps, docks, sidewalks, curbs and driveways.

(2) **Protecting Premises**. Before leaving the Premises unattended, Tenant shall close and securely lock all doors or other means of entry to the Premises.

(3) **Building Directories**. The directories of the Building, if any, shall be used exclusively for the display of the name and location of tenants and will be provided at the expense of Landlord. Any company names and/or name changes requested by Tenant to be displayed in the directories must be approved by Landlord and, if approved, will be provided at the sole expense of Tenant.

(4) **Large Articles**. Furniture, freight and other large or heavy articles may be brought into the Premises in a manner so as to not damage the Premises or the Building and always at Tenant's sole responsibility. All damage done to the Premises or the Building, their furnishings, fixtures or equipment, by moving or maintaining such furniture, freight or articles shall be repaired at the expense of Tenant.

(5) **Signs**. Tenant shall not paint, display, inscribe, maintain or affix any sign, placard, picture, advertisement, name, notice, lettering or direction on any part of the outside or inside of the building, or on any part of the inside of the Premises which can be seen from the outside of the Premises, without the written consent of Landlord, and then only such name or names or matter and in such color, size, style, character and material as shall be first approved by Landlord in writing. Landlord reserves the right to remove, at Tenant's expense, all items erected or displayed, other than those permitted herein, without notice to Tenant.

(6) **Compliance with Laws**. Tenant shall comply with all applicable laws, ordinances, codes, rules, governmental orders or regulations and applicable orders or directions from any public office or body having jurisdiction, whether now existing or hereinafter enacted with respect to the Premises and the use or occupancy thereof. Tenant shall not make or permit any use of the Premises which directly or indirectly is forbidden by law, ordinance, governmental regulations or order or direction of applicable public authority, or which may be dangerous to person or property.

(7) **Hazardous Materials**. In addition to any other restrictions contained in this Lease, Tenant shall not use or permit to be brought into the Premises or the Building any flammable oils or fluids, or any explosive or other articles deemed hazardous to persons or property, or do or permit to be done any act or thing which will invalidate or which if brought in would be in conflict with any insurance policy covering the building or its operation, or the Premises, or any part of either, and will not do or permit to be done anything in or upon the Premises, or bring or keep anything therein, which shall not comply with all rules, orders, regulations or requirements of any organization, bureaus, department or body having jurisdiction with respect thereto (and Tenant shall at all times comply with all such rules, orders, regulations or requirements), or which shall increase the rate of insurance on the building, its appurtenances, contents or operation.

(8) **Defacing Premises and Overloading**. Tenant shall not place anything or allow anything to be placed in the Premises near the glass or any door, partition, wall or window which may be unsightly from outside the Premises. Tenant shall not place or permit to be placed any article of any kind on any window ledge or on the exterior walls; blinds, shades, awnings or other forms of inside or outside window ventilators or similar devices shall not be placed in or about the outside windows in the Premises except to the extent that the character, shape, color material and make thereof is approved by Landlord. Tenant shall not do any painting or decorating in the Premises or install any floor coverings in the Premises or make, paint, cut or drill into, or in any way deface any part of the Premises or the Building without in each instance obtaining the prior written consent of Landlord. Tenant shall not drive any nail or screws, deface the Premises in any way, bore or cut for wires or other purpose, nor change electric fixtures or other appurtenances of the Premises without the written consent of Landlord. Tenant shall not overload any floor or part thereof in the Premises, or any facility (including the electric and plumbing systems) in the Building or any public corridors or elevators servicing the same by bringing in or removing any large or heavy articles and, Landlord may direct and control the location of safes, files, and all other heavy articles and, if considered necessary by Landlord, require supplementary supports at Tenant's expense of such material and dimensions necessary to properly distribute the weight.

(9) **Obstruction of Public Areas**. Tenant shall not, whether temporarily, accidentally or otherwise, allow anything to remain in, place or store anything in, or obstruct in any way, any sidewalk, court, passageway, entrance, or shipping area. Tenant shall lend its full cooperation to keep such areas free from all obstruction and in a clean and sightly condition, and move all supplies, furniture, equipment and inventory as soon as received directly to the Premises, and shall move all such items and waste that are at any time being taken from the Premises directly to the areas designated for disposal. All courts, passageways, entrances, exits, elevators, escalators, stairways, corridors, halls and roofs are not for the use of the general public and Landlord shall in all cases retain the right to control and prevent access thereto by all persons whose presence in the judgment of Landlord shall be prejudicial to the safety, character, reputation and interest of the building and its tenants provided, however, that nothing herein contained shall be construed to prevent such access to persons with whom Tenant deals within the normal course of Tenant's business unless such persons are engaged in illegal activities.

(10) **Additional Locks/Security**. Tenant shall not attach or permit to be attached additional locks or similar devices to any door or window, change any existing locks or mechanisms thereof, or make or permit to be made any keys for any door without the consent of Landlord. Upon termination of this lease or of Tenant's possession, Tenant shall surrender all keys to the

_____ Please Initial
_____ Please Initial
_____ Please Initial

Premises.  Tenant shall be solely responsible for the costs of all locks or keys other than the originals set in the premises as of the date of occupancy.

(11) **Communications or Utility Connections.**  If Tenant desires signal, alarm or other utility or similar service connections installed or changed, Tenant must obtain prior approval of Landlord, and the same shall be at Tenant's expense.  Tenant shall not install in the Premises any equipment which requires a substantial amount of electrical current without the advance written consent of Landlord.  Tenant shall ascertain from Landlord the maximum amount of load or demand for or use of electrical current which can safely be permitted in the Premises, taking into account the capacity of the electric wiring in the Building and the Premises and the needs of other tenants in the Building, and shall not in any event connect a greater load than that which is safe.

(12) **Restrooms.**  The restrooms, toilets, urinals, vanities and the other apparatus shall not be used for any purpose other than that for which they were constructed and no foreign substance of any kind whatsoever shall be thrown therein and the expense of any breakage, stoppage or damage resulting from the violation of this rule shall be borne by Tenant.

(13) **Intoxication.**  Landlord reserves the right to exclude or expel from the Building any person who, in the judgment of Landlord, is intoxicated or under the influence of liquor or drugs, or who shall in any manner do any act in violation of any of the rules and regulations of the Building.

(14) **Nuisances and Certain Other Prohibited Uses.**  Tenant shall not, without the prior written consent of Landlord, (a) install or operate any internal combustion engine, boiler, machinery, refrigerating, heating or air conditioning apparatus in or about the Premises; (b) engage in any mechanical business, utilize any article or thing, or engage in any service in or about the Premises or the Building, except those ordinarily embraced within the permitted use of the Premises specified in Article II; (c) use the Premises for housing, lodging, or sleeping purposes; (d) place any antennae on the roof or on or in any part of the inside or outside of the Building other than the inside of the Premises, or place a musical or sound producing instrument or device inside or outside the Premises which may be heard outside the Premises; (e) use any illumination or power for the operation of any equipment or device other than electricity; (f) operate any electrical device from which may emanate electrical waves which may interfere with or impair radio or television broadcasting or reception from or in the Building or elsewhere; (g) bring or permit to be in the Building complex any bicycle or other vehicle, or dog (except in the company of a handicapped person) or other animal or bird; (h) make or permit any objectionable noise or odor to emanate from the Premises; (i) disturb, solicit or canvass any occupant of the Building; or (j) do anything in or about the Premises tending to create or maintain a nuisance or do any act tending to injure the reputation of the Building.

(15) **Solicitation.**  Tenant shall not make any room-to-room canvass to solicit business from other tenants in the Building or The Hudson Condominium and shall not exhibit, sell or offer to sell, use, rent or exchange any products or services in or from the Premises unless ordinarily embraced within the Tenant's use of the Premises specified herein and specific authority granted in the lease agreement.

(16) **Energy Conservation.**  Tenant shall not waste electricity, water, heat or air conditioning and agrees to cooperate fully with Landlord to assure the most effective operation of the Building's heating and air conditioning, and shall not allow the adjustment (except by Landlord's authorized building personnel) of any controls.

(17)  **Trash Removal.**  Tenants will remove excessive trash from inside and outside their premises and shall deposit same in the dumpsters provided by Landlord.  Any large volume of trash resulting from delivery of furniture, equipment, inventory, etc., should be removed by the delivery company or Tenant.  Any costs incurred by Landlord for removal of trash shall be charged to Tenant as Additional Rent and Tenant shall pay the cost thereof to Landlord within ten (10) days after receiving Landlord's written statement setting forth the amount due and the basis for the charge to Tenant.  Tenant's failure to pay within the ten-day period shall entitle Landlord to the same remedies it has upon Tenant's failure to pay Base Rent.  Tenant will comply with the requirements of law and any requests of governmental agencies or Landlord in its recycling program, if any.

(18) **Live music entertainment.**  Tenant acknowledges that Landlord owns and has provided electronic and sound equipment of superior quality and agrees to operate said equipment as required by Landlord, to wit:

a) Plug-and-play stage must be fully used and adhered to (i.e. drum shield, padding under drums, ear buds etc. must be used);

b) Tenant to employ qualified and properly trained personnel at the expense of Tenant and who shall be the only individuals allowed to operate the electronic and sound equipment and who shall operate said equipment in a commercially reasonable manner;

c) Technician is to have full control of the plug-and-play stage; if a music venue does not comply with the stage rules, technician shall shut down the music venue;

d) Subject to Landlord's approval, Tenant shall develop a contract for its music venues to ensure that the forgoing as well as other laws, rules and ordinances are being complied with.

(19) Landlord reserves the right to make such other reasonable Rules and Regulations as deemed necessary in its reasonable business judgment, taking into account Tenant's reasonable business needs as permitted under this Lease, which from time to time may be needed for the safety, care and cleanliness of the Premises and Building, and for the preservation of good order therein.

_____ Please Initial
_____ Please Initial
_____ Please Initial

## EXHIBIT E
### Minimum Construction and Upfitting Requirements

1.  Tenant will be responsible for soundproofing and ventilation requirements per the specifications outlined by Bret Page (hereinafter the "Architect"), so as not to interfere with any adjoining commercial tenant space or with the residential condominiums above the Premises.  A detailed list of the Architect's soundproofing and ventilation requirements for this purpose will be provided by the Architect.  In the event that the soundproofing and ventilation systems installed by Tenant do not meet the specifications outlined by the Architect, Tenant will be liable for any corrections, including reinstallation of the soundproofing and ventilation for the Premises, deemed necessary by the Architect to bring said installation into compliance with the specifications, with the costs of the same to be the sole responsibility of the Tenant and not paid for out of the upfit allowance by Landlord.  Tenant shall be solely responsible for all claims, damages, and any adversarial proceedings, as well as all costs associated with the defense of such claims, including attorney's fees, resulting from the Tenant's installation of soundproofing and ventilation which does not follow and/or meet the Architect's specifications.

2.  Tenant shall utilize a general contractor acceptable to Landlord and Bret Page, or an architect acceptable to Landlord, as the architect/designer for the upfitting of the Premises.  Landlord has already installed a "grease trap" in the basement of The Hudson, but without grease drain lines which must be installed by the Tenant.  All costs associated with (i) connecting the Premises to the grease trip, (ii) of keeping the grease trap pumped in accordance with all laws, regulations, codes, rules and ordinances, and (iii) maintaining and cleaning the grease ducts, shall be the sole responsibility of Tenant.

3.  Tenant shall conform to the build out specifications pertaining to the exterior of The Hudson and all other mechanical systems and applications, as outlined, addressed and/or specified by the Architect and approved by Landlord.

_____ Please Initial
_____ Please Initial
_____ Please Initial

## Dorrestein & Crane

Dorrestein & Crane, P.C.
141 Providence Road
Suite 160
Chapel Hill, North Carolina 27514
Telephone (919) 401-6715
Facsimile (919) 401-6785

Ronald Dorrestein, Esq.
ron@dorresteincrane.com

February 6, 2008

VIA FEDEX DELIEVERY

YancyJazz, LLP
319 Fayetteville Street, Suite 105
Raleigh, NC  27601

Re: Lease dated May 1, 2007 between Joyner Realty
Company, Inc., as Agent for the Barney G. Joyner Family
Trust, and YancyJazz, LLP for Suite 105 of The Hudson (the
"Premises")

Dear Mark Valentine:

As you are aware, our firm represents The Barney G. Joyner Family Trust, the landlord under the above-referenced Lease ("Landlord"), and its agent, Joyner Realty Co., Inc.   Please disregard my letter to YancyJazz, LLP dated February 5, 2008, as the same incorrectly identified the Premises.  According to the Lease, all rents are due and payable on the first day of each month of the term, in advance.  If rents are not received by the fifth (5th) day of the month it is due, the Lease provides that Tenant is subject to a late charge of 4% plus interest at 8%.   You have failed/refused to pay the rents due under the Lease for February of 2008 in the total amount of $23,000.00 (base rent and additional rent).   You now owe the sum of $23,945.20 for past due rent, the late charge and interest pursuant to the Lease.

Notice is hereby given pursuant to the Lease that YancyJazz, LLP is in default of the Lease.  In the event you fail to cure said default, by delivering the outstanding rent, late charge and interest (which will continue to accrue at $25.20 per day through the date of payment to Landlord's agent) within five (5) calendar days from your receipt of this letter, Landlord will take such steps as it deems necessary to protect its interests.

Sincerely,

Ronald Dorrestein

cc: Joyner Realty Co., Inc. (via e-mail)
     John P. Marshall, Esq. (via FedEx delivery)

## <u>CERTIFICATE OF SERVICE</u>

It is hereby certified that the foregoing MOTION FOR ORDER REQUIRING  DEBTOR TO ASSUME OR REJECT NON-RESIDENTIAL REAL PROPERTY LEASE was served this day by placing copies thereof in a depository under the exclusive care and custody of the United States Postal Service in postage prepaid envelopes and properly addressed as follows:

J. M. Cook                                          Ryan Dyson
Bankruptcy Administrator                Ryan Dyson, PLLC
P.O. Box 3758                                    8520 Six Forks Road, Suite 101
1760B Parkwood Boulevard          Raleigh, NC 27615-2962
Wilson, NC 27895-3758


YancyJazz, LLP
319 Fayetteville Street
Raleigh, NC 27601


DATED:  March 6, 2008


*s/Jennifer H. Davison*
Jennifer H. Davison
Paralegal

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## WILSON DIVISION

YancyJazz, LLP,                                          CASE NO. 08-01071-8ATS

        Debtor.                                          CHAPTER 11

### NOTICE OF MOTION

NOTICE IS HEREBY GIVEN of the Motion for Order Requiring Debtor to Assume or Reject Non-Residential Real Property Lease filed simultaneously herewith seeking an order requiring the Debtor to assume or reject its non-residential real property lease for the premises located at 319 Fayetteville Street, Raleigh, North Carolina, and a determination that post-petition rents shall be accorded allowed administrative claim status.

FURTHER NOTICE IS HEREBY GIVEN that if you fail to respond or otherwise plead or request a hearing within 15 (fifteen) days from the date of this Notice, the relief requested in the Motion may be granted without further hearing or notice; and

FURTHER NOTICE IS HEREBY GIVEN that if a response and a request for a hearing is filed within the time indicated, a hearing will be conducted on the Motion and response thereto at a date, time and place to be later set by this Court and all interested parties will be notified accordingly.  If no request for a hearing is timely filed, the Court may rule on the Motion and response thereto *ex parte* without further notice.

DATED:  March 6, 2008

                        s/Stephani W. Humrickhouse
                        Stephani W. Humrickhouse
                        State Bar # 9528
                        NICHOLLS & CRAMPTON, P.A.
                        Post Office Box 18237
                        Raleigh, North Carolina  27619
                        Telephone:  919-781-1311
                        shumrickhouse@nichollscrampton.com

4

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## WILSON DIVISION

**YancyJazz, LLP,**                                    **CASE NO. 08-01071-8ATS**

          **Debtor.**                                 **CHAPTER 11**


### CERTIFICATE OF MAILING

I, Jennifer H. Davison, of Nicholls & Crampton, P.A., Post Office Box 18237, Raleigh, North Carolina certify that on March 6, 2008 I mailed a copy of the foregoing Notice of Motion for Order Requiring Debtor to Assume or Reject Non-Residential Real Property Lease, by placing said copy in the United States Mail, postage prepaid to the following:

J. M. Cook                        Ryan Dyson
Bankruptcy Administrator          Ryan Dyson, PLLC
P.O. Box 3758                     8520 Six Forks Road, Suite 101
1760B Parkwood Boulevard          Raleigh, NC 27615-2962
Wilson, NC 27895-3758


YancyJazz, LLP
319 Fayetteville Street
Raleigh, NC 27601


I certify under penalty of perjury that the foregoing is true and correct.


This 6th day of March, 2008.


                                    s/Jennifer H. Davison
                                    Jennifer H. Davison
                                    Paralegal


*O:\CH11 CRD\A - JOYNER FAMILY TRUST\lease.assum.rej.mot.wpd*